ITT CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 48–84C.

United States Claims Court.

April 6, 1989.

As Amended May 12, 1989.

John E. Kidd, New York City, for plaintiff. Nicholas L. Coch and Patricia A. De Meyere, Anderson Russell Kill & Olick, P.C., of counsel.

Robert A. Molan, Washington, D.C., with whom were Vito J. DiPiertro, and Asst. Atty. Gen. John R. Bolton, for defendant. Thomas J. Byrnes, B. Frederick Buchanan, Jr., Dept. of Justice, and Robert F. Altherr, Jr., Dept. of the Army, of counsel.

## OPINION

NETTESHEIM, Judge.

Before the court, after trial, is the accounting phase of this patent infringement litigation. Post-trial briefing on selected issues has been completed.

## BACKGROUND

Plaintiff ITT Corporation ("plaintiff" or "ITT") brought suit pursuant to 28 U.S.C. § 1498 (1982), claiming reasonable and entire compensation for the unlicensed use of three patents held by plaintiff as assignee. Since 1978 the United States has procured through Hughes Aircraft Company ("Hughes") the accused fiber optic devices. Plaintiff charged that the devices infringed United States Patent No. 3,936,145 entitled

"Fiber Optic Alignment Sleeve" (the " '145 patent"), which disclosed an alignment sleeve; United States Patent No. 3,947,182 entitled "Fiber Optic Connector with Axial Tolerance Relief" (the " '182 patent"), which disclosed a termination pin assembly; and United States Patent No. 4,047,797 entitled "Fiber Optic Connector" (the " '797 patent"), which disclosed a strain relief. Trial held during March and April 1986 determined the validity of the patents and the charges of infringement.

The court held the '182 and '797 patents to be both valid and infringed; the '145 patent was held valid, but not infringed. *ITT Corp. v. United States*, 10 Cl.Ct. 321 (1986).[1] Familiarity with this fact-intensive opinion is presumed.

In the liability phase, a principal question was whether the claimed patents disclosed merely existing electrical devices that were converted to fiber optic use or whether plaintiff's inventions were pioneering. It was found that "marked similarities exist between electrical and fiber optics technology...." and that there was a "gradual evolution of fiber optics from electrical technology." *ITT Corp.*, 10 Cl.Ct. at 324. However, plaintiff's patents were designed to address problems peculiar to fiber optics and not encountered in the existing electrical art. Based on the testimony of plaintiff's Leslie M. Borsuk, Director of Engineering for ITT–Cannon, and others, the court found six problems that the technology applicable to electrical connectors could not solve and that the technology applicable to fiber optics was applied to correct: 1) lateral misalignment; 2) gap misalignment (no significant gap can be present when two fiber optics are joined); 3) axial tipping or angular misalignment; 4) axial tolerance relief; 5) fragility of fibers; and 6) the manner of fastening optic fibers to a contact. *Id.* at 328. The court concluded:

In short, the most significant difference between the technologies of fiber optics and electricity is the necessity in fiber optics to construct connectors in a manner which diminishes lateral, gap, and angular misalignment. These mechanical degrees of freedom are not part of the calculus employed in the construction of an electrical connector.

*Id.* at 329 (footnote omitted).

It was found that the '182 and '797 patents addressed problems peculiar to fiber optics and that the '145 patent supplemented the efforts of the '182 patent. *ITT Corp.*, 10 Cl.Ct. at 329–31. Holding the three patents valid against defendant's citations to the prior art, the court next looked to the accused devices to determine whether the '182 and '145 patents were infringed by the doctrine of equivalents, and whether the '797 patent was infringed literally or by the doctrine of equivalents.

The accused device covered by one or more claims of the '182 patent was depicted as PX–25, and those covered by one or more claims of the '797 patent, as PX–28, 29, 31, and 32. The '145 patent was alleged to be infringed by the accused devices depicted as PX–26 and 26A. Mr. Borsuk's testimony about claim 1 of the '182 patent, coupled with PX–25 and the physical exhibit of an accused device, was held to support a finding of infringement by the doctrine of equivalents, and Mr. Borsuk's testimony on claim 2 established that the patent was infringed in the same manner. *ITT Corp.*, 10 Cl.Ct. at 380–84. Claims 1 and 13 of the '145 patent and the Hughes sleeve depicted in PX–26 and 26A both accomplish alignment, but do so in different ways; therefore, the court found that the Hughes devices failed to satisfy the doctrine of equivalents. *Id.* at 384–87. The court found that the accused devices depicted as PX–28, 29, 31, and 32 infringed the '797 patent under the doctrine of equivalents.

**1.** The printed opinion contained 3 errors that were discovered during the 1988 trial. Mr. Borsuk was identified as ITT–Cannon's Director, when he held the position of Director of Engineering, and the opinion reported at *ITT Corp.*, 10 Cl.Ct. at 322, is corrected accordingly. It was in 1974, not 1984, that Mr. Peterson gave Mr. Arnold a stack of fiber optic patents, and the opinion, *id.* at 335, is corrected accordingly. The preamble to claim 2 of the '182 patent was ruled not to constitute a claim limitation. *Id.* at 335–37 & n. 5; *see also infra* note 18. Subsequent references to PX–25 as representing a connector for a pair of cables, *e.g.*, 10 Cl.Ct. at 383, do not change this ruling.

However, claims 1, 6, 9, and 12 of the '797 patent asserted against the accused devices depicted as PX–27, 30, and 33 did not infringe the '797 patent either literally or by the doctrine of equivalents. *Id.* at 387–95 & n. 35.

## DISCUSSION

### I. Compensation Base

■ In the accounting phase of an action brought pursuant to 28 U.S.C. § 1498 ("section 1498"), the objective is to provide the patent holder with reasonable and entire compensation for the Government's unlicensed use of plaintiff's patents. A section 1498 action differs from an action brought against a private infringer under 35 U.S.C. § 281 (1982), since the former is treated as an "eminent domain taking of a patent license," not a tort claim for patent infringement. *Leesona Corp. v. United States*, 220 Ct.Cl. 234, 247, 599 F.2d 958, 966, *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). "[E]quitable principles of fairness are the governing consideration in determining just compensation for an eminent domain taking...." *Tektronix, Inc. v. United States*, 213 Ct.Cl. 257, 265, 552 F.2d 343, 347 (1977), *cert. denied*, 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978); *see also Calhoun v. United States*, 197 Ct.Cl. 41, 51, 453 F.2d 1385, 1391 (1972). Delay compensation has been held to inhere in the concept of reasonable and entire compensation. *Decca, Ltd. v. United States*, 225 Ct.Cl. 326, 337, 640 F.2d 1156, 1168 (1980), *cert. denied*, 454 U.S. 819, 102 S.Ct. 99, 70 L.Ed.2d 89 (1981).

■ One approach to achieve this objective is for a court to determine an applicable compensation base and to apply a reasonable royalty rate to this figure. *Leesona*, 220 Ct.Cl. at 259, 599 F.2d at 973. The Court of Claims explained in *Leesona*:

> The nature of the property taken by the government in a patent infringement suit has traditionally been a compulsory compensable license in the patent, and just compensation has in most cases been defined by a calculation of a "reasonable royalty" for that license, or, when a rea-

sonable royalty cannot be ascertained, another method of estimating the value of the lost patent.

220 Ct.Cl. at 250, 599 F.2d at 968 (citations omitted). In determining the compensation base and fixing a reasonable royalty rate, the court should focus on the date of the taking by the Government in order to capture the actual value of the patent. *See Decca*, 225 Ct.Cl. at 336, 640 F.2d at 1167.

"The proper measure in eminent domain is what the owner has lost, not what the taker has gained." *Leesona*, 220 Ct.Cl. at 253, 599 F.2d at 969 (citation omitted). Judge Colaianni in *Dynamics Corp. of America v. United States*, 5 Cl.Ct. 591 (1984), *aff'd in part, rev'd in part, and remanded on other grounds*, 766 F.2d 518 (Fed.Cir.1985), formulated this principle, as follows:

> The ultimate goal in all accounting cases is to compensate the patent owner for what he has lost as a result of the infringer's actions. In the Claims Court, the compensation to which a patent owner is entitled is evaluated from the point of view of the patentee and not from the view of the infringer....

5 Cl.Ct. at 605.

■ The compensation base in combination with a reasonable royalty rate should derive entire, but not excessive, compensation. *Bendix Corp. v. United States*, 230 Ct.Cl. 247, 258, 676 F.2d 606, 612 (1982); *Tektronix*, 213 Ct.Cl. at 272, 552 F.2d at 351. The rule that a patent holder bears the burden of proof on damages, *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1574 (Fed.Cir.1988), applies to a section 1498 action against the Government. The evidence must be sufficient to support a fully informed and reasoned decision. *Leesona*, 220 Ct.Cl. at 269, 599 F.2d at 979.

### 1. *Hughes' sales data*

The liability trial determined that the accused Hughes devices infringed plaintiff's patents disclosing the termination pin assembly and the strain relief. *ITT Corp.*, 10 Cl.Ct. at 382, 386. This opinion issued on

July 25, 1986. The parties lumbered to trial on the accounting phase in late 1988. The accounting trial ascertained plaintiff's entitlement under 28 U.S.C. § 1498 for the stipulated period of February 1, 1978, when Hughes began selling fiber optic connectors, through July 22, 1988, the most recent date for which Hughes supplied information of its sales to the Government. Since the '182 and '797 patents expire, respectively, in 1993 and 1994, the accounting phase must be extended.

Plaintiff and defendant advocated different methodologies for ascertaining the proper compensation base. Its own methodology, in each party's view, ultimately would provide plaintiff with reasonable and entire compensation. The court found both approaches to be credible and helpful to the court's determination. Plaintiff and defendant were faced with the task of using a third party's sales information to compute the measure of plaintiff's entitlement. Although the same sales information was provided to both parties, each encountered problems in reconciling it. As a result, plaintiff and defendant generated different total sales figures for Hughes' sales.

Linda DiMatteo, a legal assistant to plaintiff's counsel, and Peggy Ann Stulberg, counsel's computer technologist, testified to a systematic approach for transferring the Hughes sales data to the law firm's data base in order to calculate a total of all Hughes' sales.[2] Maureen Asonevich, a legal assistant and Craig H. Ekholm, a data processing section manager, both of whom worked for defendant's data analyst, CACI, Inc., testified to a similar process for capturing the Hughes sales information. However, defendant's line item total and computed total differed from plaintiff's. Defendant's line item total and computed total were themselves inconsistent. The court does not find significant the disparity in the sales figures, both be- cause the dollar amounts are not large and because the data developed by the parties substantially correspond. Both parties made a conscientious attempt to present the best evidence that they were capable of devining from the Hughes sales information. Since neither party was familiar with the manner in which Hughes utilized its own sales information to record its operations (despite having conducted multiple depositions to discover not only where Hughes' sales information could be found, but how to interpret all save the latest iteration), plaintiff and defendant were confronted with the need to make limited judgment calls. Defendant also admitted through Mr. Ekholm that some double counting took place in its analysis. This was caused by inclusion of part numbers represented in two categories. According to Mr. Ekholm, the difference in the parties' final total sales figures possibly could be explained by this misinclusion, although the court is unable to make a finding on point based on the several plausible explanations of record.

2. *Categorization of fiber optic products and services sold by Hughes*

In order to enable the court to establish a compensation base from the Hughes sales data, the parties established categories breaking down the various "fiber optic connector products" and services sold by Hughes. The total of the categories equaled Hughes' total unit sales for fiber optic products and services.

The License Agreement dated August 1, 1985, entered into by plaintiff and Allied Corporation (the "ITT/Allied agreement"), and the License Agreement dated April 1, 1987, entered into by plaintiff and Hughes (the "ITT/Hughes agreement"), provide definitions that help explain the category breakdowns employed by the witnesses for each party.[3]

---

**2.** Hughes' "sales recaps" contained the information used to create both plaintiff's and defendant's computer data bases. The following is a list of the relevant information contained in the sales recaps: 1) part number; 2) customer number; 3) customer name; 4) quantity; 5) dollar amount; and 6) average unit price.

**3.** As discussed in *ITT Corp.,* 10 Cl.Ct. at 379, the ITT/Allied agreement had been put under seal and was not referred to by name in the opinion. *See* order entered Apr. 8, 1986, ¶ 4. Based on the May 15, 1985 Stipulated Protective Order Pursuant to Claims Court Rule 26(c), the Clerk of the Court put the ITT/Hughes agreement

Article I, "Definitions," of the ITT/Allied agreement defines "Licensed Patent" in section 1.1. as "any unexpired patent listed on Schedule A attached hereto and any reissues, reexaminations or extensions thereof, and any patents issuing from the applications listed on Schedule A and any reissues, reexaminations or extensions thereof." The ITT/Hughes agreement adopts the same definition. Both license agreements also contain the same definition for "Fiber Optic Connector." Section 1.2 provides: " 'Fiber Optic Connector' shall mean a connecting device for joining or fastening together one or more optical fibers or cables. Such device shall include any device which in addition to joining together optical fibers or cables also performs some other connecting or other function." Section 1.3 of the ITT/Allied agreement and section 1.4 of the ITT/Hughes agreement entitled "Components" differ only with respect to the last sentence of the definition. ITT/Allied's section 1.3 states: " 'Components' shall mean a part of a Fiber Optic Connector shipped separately and which is sold for assembly with other parts to form a Fiber Optic Connector coming within the scope of one or more claims of any Licensed Patent. Contacts shall be considered Components." Section 1.4 of the ITT/Hughes agreement replaces the last sentence with "Components shall not include Contacts or single-slotted fiber optic contact alignment sleeves."

Section 1.3 of the ITT/Hughes agreement defines "Contacts," as follows:

"Contacts" shall mean a part to be either attached to an end of an optical fiber or cable, or to be inserted into a fiber optic connector to mate with a part attached to the end of an optical fiber or cable, and which is shipped separately and either (a) comes within the scope of one or more claims of any Licensed Patent or (b) is sold for assembly with other

parts to form a Fiber Optic Connector coming within the scope of one or more claims of any Licensed Patent.

The ITT/Hughes agreement has a separate royalty rate for contacts. Section 1.3 of the ITT/Allied agreement treats contacts as components. Since a component bears a higher royalty rate in both agreements, plaintiff benefits if the ITT/Allied definition, but not the ITT/Allied rate, is applied. The ITT/Allied and ITT/Hughes agreements contain similar definitions for "Licensed Product." Section 1.5 of the ITT/Allied agreement provides: " 'Licensed Product' shall mean any Fiber Optic Connector which comes within the scope of one or more claims of any Licensed Patent or Component thereof." The ITT/Hughes agreement breaks out contacts, since they are a separate category.

The starting point for both parties in assigning Hughes' fiber optic connector sales to categories was DX–4700 entitled "METHODOLOGY USED BY ITT TO PREPARE CATEGORY LISTS OF PART NUMBERS FOR HUGHES FIBER OPTIC CONNECTOR PRODUCTS." From this document the original categories were established. Thomas L. Peterson, Patent Counsel for ITT–Cannon, who prepared the exhibit, explained his method for identifying the part numbers of the infringing devices standing alone, used alone in Hughes' connector devices, or used together in Hughes' devices. The document also identified additional sales items, products, and services, which were part of Hughes' total fiber optic sales to the Government.

Mr. Peterson testified to plaintiff's methodology, which was primarily a categorization of the part numbers with attribution of sales dollars to the individual part numbers. PX–3142 represents Mr. Peterson's "CHRONOLOGY OF ITT EFFORTS TO OBTAIN SALES INFORMATION FROM HUGHES." Mr. Peterson testified that he

under seal on February 2, 1989. However, the terms of both licenses were displayed in the transcript without restriction. The court could not establish the compensation base without discussing the definitional sections of both license agreements, since Mr. Peterson categorized part numbers based on definitions in the

ITT/Hughes agreement. Moreover, with plaintiff urging adoption of royalty rates greater than those in both agreements, the court cannot make the requisite findings without disclosing these rates. Plaintiff and Hughes do not object to the disclosures in this opinion.

met with Hughes' legal, engineering, and marketing representatives to develop the categories for fiber optic connector products. Plaintiff's final categorization was established through this coordinated effort by plaintiff and Hughes.

Mr. Peterson described the approach that he took in establishing categories and classifying part numbers to categories. He explained that he was tasked with collecting documentation from Hughes in order to identify prices and sales numbers for Hughes fiber optic connector products. He also stated that he sought any other information that would enable him to categorize the part numbers. Based upon his meetings with Hughes personnel and the information they provided, Mr. Peterson began his categorization efforts.

Mr. Peterson explained his development of the original categories in conjunction with Hughes. He testified how the original categories were later reflected in PX–3117, his summary of Hughes' sales by category, as follows:

Category 1A, pin contacts. Category 1B, jumper cables and pigtails that are using pin contacts. Category 2A, socket contacts. Category 2B, jumper cables that use only socket contacts. Category 3, connector halves which comprise the disassembled parts which accept pin contacts but do not use the infringing strain relief which is described in Category 4. Category 4 are connector halves with the infringing strain reliefs of PX 28, 29, 31, and 32.

Category 5, connector halves that combine both pin contacts and the infringing strain reliefs. Category 7A, which are connector halves containing socket inserts. That means they're adapted to contain socket contacts and do not contain pin contacts or infringing strain reliefs. Category 11A, connector halves which are non-hermaphroditic, single-channel connectors which can receive either a pin or socket contact.

I'm not certain of Category 12 because Category 12 was not added at that time but it was added at a later time. Onto the second page, Category 6A, connector cable assemblies containing either pin contacts or the infringing strain reliefs. Category 6B, connector cables that use both pin contacts and infringing strain reliefs. Category 7B are connector cable assemblies that contain, adapted to contain socket contacts and do not contain pin contacts or infringing strain reliefs.

Category 11B, connector cable assemblies which are non-hermaphroditic, single-channel connectors on those cable assemblies that may receive either a pin or a socket contact. And then there were other categories, 8, 9, 10 that we had originally created that I—do not appear in their present form on this chart, and Category 8, I think, was special connectors and Categories 9 and 10 had to do with engineering and labor charges and as it turns out, I do not conclude that those categories were particularly meaningful and we set up some new categories here on this chart to try to cover that and some other subjects and products.

Mr. Peterson testified that Hughes supplied computer runs which were designed to pick up pin contacts, socket contacts, and the fiber optic connectors containing them. The computer runs provided the primary data that Mr. Peterson used to classify part numbers. Hughes also supplied drawings that enabled Mr. Peterson to "allocate the part numbers on the computer runs into these various categories." In October 1988, during the deposition of Thelma M. Fowler, Hughes' long-time head of Customer Service, Mr. Peterson discovered that a list of all the part numbers of the Hughes fiber optic connector products could be generated. Hughes generated a part number list for plaintiff's use. Hughes also supplied a price list that was broken down by part numbers. The additional information enabled Mr. Peterson to categorize further the part numbers that appeared in Hughes' sales recaps.

Mr. Peterson was able to classify an additional 300–400 part numbers based upon the information contained in the price list, parts numbers lists, and drawings that were provided by Hughes. Plaintiff allo-

cated approximately 630 out of 800 part numbers to categories. Mr. Peterson later obtained additional drawings and engineering drawing lists that contained descriptions of parts for the remainder of the uncategorized part numbers. New categories were created by Mr. Peterson to classify the remaining part numbers. Plaintiff's final categorization captured all of the data for the part numbers in the Hughes sales recaps.

Mr. Peterson explained how he created the new categories. He placed all pin contacts, socket contacts, jumper cables, and pigtails in Categories 1 and 2. Category 5A included disassembled connector halves which could contain pin or socket contacts. Category 12 included dust covers sold apart from connectors. Category 14 included piece parts used in connector halves and connector cable assemblies. Category 15 included all undocumented part numbers. Category 16 included star couplers and electrical connector part numbers. Category 6C included connector cable assemblies which could not be identified as containing pin or socket contacts or infringing strain reliefs. Category 9T included tools and fixtures; 9F included fixtures alone; and 9E included custom developmental work. Category 10 included charges for special assembly, design, labor, lot, stocking, termination, and training charges. Mr. Peterson testified that part numbers were recategorized based upon the additional Hughes information until a final iteration was reached. PX–3117A reflects the final classification attempt by plaintiff of Hughes' part numbers into Mr. Peterson's categories.

On cross-examination Mr. Peterson was asked to review a number of drawings in order to enable an assessment of whether the corresponding part numbers were properly categorized. Defense counsel presented 14 drawings that Mr. Peterson agreed he had classified incorrectly. He admitted that he had classified many of the part numbers based on the information contained in the Hughes computer runs without verifying the information against the drawings identified by part numbers. Some of Mr. Peterson's later classifications were based on drawings, but he did not undertake to classify all part numbers based on drawings, nor did he verify with the drawings whether previously categorized part numbers were correctly categorized.

Defendant's expert in fiber optic connectors, John A. Makuch, Vice President of Sales and Marketing for Lightwave Communications, testified to the methodology he followed in categorizing Hughes' sales data for fiber optic connector products. As an inventor or co-inventor of seven patents for fiber optic devices, including a pin assembly (and a method for terminating it) and a fiber optic connector assembly, Mr. Makuch brought more cogent technical skill to his assignment than did Mr. Peterson. Mr. Makuch, who holds master's degrees in business administration and physics, has specialized since 1975 in marketing fiber optic devices. The court does not disserve Mr. Peterson's careful testimony by crediting Mr. Makuch, who was not affiliated with defendant beyond acting as its expert, with more accurate and compelling testimony. Indeed, as the court advised the parties at trial, Mr. Makuch was the most impressive witness in the accounting phase.

Mr. Makuch's general approach was similar to Mr. Peterson's. Mr. Makuch began his inquiry with a review of the exhibits that depicted the '182 and '797 patents, along with Hughes' engineering and sales drawings.[4] He also reviewed DX–4700, which Mr. Peterson testified broke down the part numbers into the categories that Hughes and Mr. Peterson had established. Mr. Makuch's methodology involved a review of drawings prearranged to correspond with the categories in DX–4700. The drawings were used as a checklist against Mr. Peterson's categorization and a basis for reclassifying incorrectly listed part numbers into alternative categories. Mr. Makuch, as had Mr. Peterson, created

---

**4.** Mr. Makuch testified that he reviewed PX–25, 28, 29, 31, and 32, which were drawings depicting the accused Hughes devices that were found to infringe plaintiff's patents.

a number of new categories. In large part, these new categories paralleled those created by Mr. Peterson. No part numbers that plaintiff included in its categorization were excluded in Mr. Makuch's.

Mr. Makuch testified that he began with Mr. Peterson's Category 1A. Mr. Makuch obtained the drawing that corresponded with the first part number appearing in the category. He attempted to identify features in the engineering and sales drawings that matched the features of the accused devices depicted in PX–25, 28, 29, 31, and 32. After reviewing each drawing, he noted whether it was categorized properly or if the part number should be designated into another category. If Mr. Makuch could not substantiate that a part number was categorized incorrectly based on a drawing or listing, the part number was left in Mr. Peterson's original category. Drawing listings were sometimes used when there was no drawing available. Mr. Makuch's final categorization of the Hughes engineering drawing and drawing listings was detailed in DX–4717.

Mr. Makuch testified that he engaged in an item-for-item investigation for all part numbers. He described a three-step process. He would look for the part number on DX–4700. He would find the drawing that corresponded to the part number. Finally, he would verify that the part number was categorized properly. Mr. Makuch demonstrated the process that he undertook with part number 1093201 and found this part number to be categorized properly. He testified that the process was performed sequentially throughout all categories.

Mr. Makuch also testified regarding the drawing depicted in DX–4705A. The drawing identified part number 1143932, which plaintiff had placed in Category 3. Category 3 included connector halves which accepted pin contacts and did not contain strain reliefs. A review of the drawing led Mr. Makuch to conclude that the device depicted was not a connector half. He concluded that it was a polishing tool. Therefore, in his opinion the part number had been miscategorized, and he transfer-red the part number to Category 13, which called for assembly tools.

Plaintiff subjected Mr. Makuch to a similar examination of his categorization of part numbers as that experienced by Mr. Peterson. He was shown to have miscategorized only two of the part numbers used by Mr. Peterson. Plaintiff elicited testimony that Hughes' computer runs did not correspond to the drawings used by Mr. Makuch. Mr. Makuch also was able to categorize a list of part numbers that did not appear in DX–4700 using the drawings.

Mr. Makuch created categories in addition to those in Mr. Peterson's DX–4700. His categories are similar to Mr. Peterson's. Category 8 contains "Specials." These were prototypes, experimental devices, and engineering models of non-production items. Category 10 contains charges for labor only. This classification derived from the wording of the listing and included assembly, termination, training, premium, and repair charges. Category 13 contains assembly tooling for sale. Category 14 contains piece parts. Mr. Makuch identified Category 14 as a difficult category because it contains items that with further "finishing" could become part of a connector, pin contact, or strain relief. Category 15 contains electrical connectors or electrical contacts. This category also included optical couplers and SMA906 connectors which have no characteristics of the infringed patents.

Subsequent to Mr. Makuch's initial classification effort, he received additional drawings which he classified in the same manner as the earlier part numbers, except that he did not begin with Mr. Peterson's DX–4700. Mr. Makuch's classification methodology included the categorization of words or definitions in the same manner as part numbers.

### 3. *Entire market value rule*

In *TWM Manufacturing Co., Inc. v. Dura Corp.*, 789 F.2d 895, 901 (Fed.Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986), the Federal Circuit stated: "The entire market value rule allows for the recovery of damages based on the

value of an entire apparatus containing several features, when the feature patented constitutes the basis for customer demand." (Citations omitted.) The Court of Claims in *Leesona* articulated this principle, as follows:

> Under the entire market value rule, it is not the physical joinder or separation of the contested items that determines their inclusion in or exclusion from the compensation base, so much as their financial and marketing dependence on the patented item under standard marketing procedures for the goods in question....

220 Ct.Cl. at 262, 599 F.2d at 974. In applying the entire market value rule, the court must determine what units qualify to be part of the compensation base, taking into account the patent holder's expectations of selling unpatented items in conjunction with patented ones. *See Tektronix*, 213 Ct.Cl. at 272, 552 F.2d at 351.

Mr. Borsuk, plaintiff's top employee in charge of developing fiber optic connectors, interpreted the ITT/Allied and ITT/Hughes definitions, quoted *supra* at p. 204, in the following manner. Mr. Borsuk defined connectors in terms of connector cable assemblies. According to Mr. Borsuk, a connector cable assembly is a device having a connector on each end and fiber or cable in between them. He defined a connector cable assembly as "the assembly of a connector, of connector components, hardware, and a cable, [fiber optic] cable, as a final assembly. These are the kinds of things we produce and sell." Mr. Borsuk described the types of connector cable assemblies produced by plaintiff. He defined a "hermaphroditic cable assembly" as a device with a long length of fiber cable with a connector at each end. A "jumper cable assembly" was defined as having a short length of cable with a connector on each end usually containing a plug on one end and a receptacle on the other. He defined a "pigtail assembly" as having a connector with individual fibers on one end with single channel plugs on the opposite end. A pigtail is used to attach a fiber to a light-emitting diode or to a photodiode. A plug receptacle accepts pin or socket contacts. A hermaphroditic connector contains features of both the pin and socket contacts. Channel refers to the number of pins and sockets that a connector half will accept.

Norbert L. Moulin, Senior Scientist in Hughes' Connecting Devices Division, who appeared during the liability trial, testified by deposition in this phase that the pin contact is "universally used" in Hughes' connectors. Plaintiff contends that, in determining the application of the entire market value rule, the court should focus on connector cable assemblies. Plaintiff viewed all of its connector cable assemblies as integral to establishing a fiber optic system. Plaintiff posits, through Mr. Borsuk, that "integral" means able to accomplish every task in the system. Plaintiff argued that the court's starting point must be the connector cable assembly because it is the unit necessary for the termination pin assembly to function. Mr. Borsuk testified that the patented devices only function within an entire fiber optic system.

Plaintiff's proof of the compensation base emphasized both its own and Hughes' expectations to sell related products that they sold in conjunction with the patented and infringing devices, respectively. Plaintiff's witnesses were Mr. Borsuk and Stacey T. Dollar, an associate of Mr. Borsuk's at ITT–Cannon who formerly worked for Hughes. Mr. Borsuk's testimony primarily was directed to describing related sales in connection with the sale of licensed products and characterizing these sales as integral. According to Mr. Borsuk, the significant related device that plaintiff sold was the connector cable assembly because it was integral to the patented devices; moreover, plaintiff asserted that it expected to experience additional related sales along with the sales of connector cable assemblies which were not themselves related to the patented items. Plaintiff argues that all related sales should be included in the compensation base.

Mr. Borsuk testified, as he did in the liability trial, about the driving factors behind the use of fiber optics. Among the advantages of fiber optics for military applications, Mr. Borsuk cited the extremely

high band width or information carrying capacity; the size and weight of a fiber in contrast to the larger and heavier electrical equivalent; the dielectric nature of fiber optics, *i.e.*, the fibers do not conduct electricity; the elimination of cross-talk; and the elimination of electronic bugging.

Mr. Borsuk also refreshed the record as to specific problems unique to fiber optics. Mating alignment is required to obtain the proper fiber-to-fiber link necessary for the transmission of data. Cable retention, or strain relief, is necessary because of the fragile nature of glass fibers. The connectors must be rugged in order to handle tactical application. It was Mr. Borsuk's opinion that a pin contact's utility derives from its ability to form a mated pair. This ability, he concluded, can only be created in a connector shell environment.

Plaintiff's counsel elicited testimony from Mr. Borsuk about the value of a connector half standing alone. The witness viewed connector halves as having no stand-alone value. Connector halves were also incompatible with non–ITT–Cannon products such as Hughes or American Telegraph & Telephone Company ("AT & T") devices, *i.e.*, they could not form a mated pair. However, Mr. Borsuk noted that Hughes produced parallel products to those manufactured by plaintiff.

Mr. Borsuk prepared a drawing in connection with his testimony on a "military fiber to fiber, system to system operation." The drawing is indicative of the tactical uses of connector cable assemblies. Mr. Borsuk described how the various devices produced by plaintiff are used in a field operation. A system-to-system operation, as described by the witness, would employ jumper cable assemblies, hermaphroditic long-length cable assemblies, as well as pigtail assemblies. Pigtail assemblies connect directly to transmitter/receivers. Mr. Borsuk stated that hermaphroditic connector cable assemblies are used because the nature of tactical field application requires that a connection be made to a matching connector half in the field, "so that no matter which end of the cable you start with you can plug it in." Mr. Borsuk also

testified that the connector cable assemblies can be adapted to contain a plug with all male pin contacts that mates with a receptacle containing all female socket contacts.

Mr. Borsuk demonstrated an ITT Fiber Optic Multi–Channel ("FOMC") connector cable assembly, containing a plug on each end, which he referred to as a jumper cable assembly. The device included two dust caps tethered to each end of the assembly by a short wire. According to Mr. Borsuk, the dust caps always were sold tethered in this manner. The dust covers, like the connector halves, were capable of mating themselves to form a sealed unit.

Connector cable assemblies were sold either assembled or as components. The components were usually sold to Original Equipment Manufacturers ("OEM's"), which themselves assembled the devices. Mr. Borsuk stated that the OEM's had to be trained in order to assemble plaintiff's devices. OEM's could obtain catalogues from plaintiff which explained the connector assembly procedures.

Mr. Borsuk described all the parts comprising the FOMC connector as necessary to the function of the termination pin assembly. In his view the '182 patent, which the court found to be infringed, had no stand-alone function. Mr. Borsuk responded to a question by plaintiff's counsel regarding the parts necessary for a pin contact to function, as follows:

Q. What does it need to perform the function of mating two fibers?

A. It needs the remainder of connector components assembled about it, such that the two opposing connectors will mate two opposing fibers. Otherwise, they won't stay together, they won't line up, they won't perform.

Mr. Borsuk also demonstrated how the '797 strain relief works in conjunction with other parts of a connector half. He described a cylindrical crimp sleeve crimped to the end of the cable which holds in place the fiber that extends out from the cable housing. The termination pin assembly is epoxied to the fiber after the fiber passes through the pin assembly. Next,

the end of the fiber is cleaved or scribed to make it flush with the end of the pin assembly. The end of the pin assembly is then placed in a polishing fixture for the fiber to be ground and polished. The strain relief, which is in a hexagonal shape, fits into a hole and is locked in place when the rear portion of the connector shell is attached to its front locking mechanism. Extending from this rear portion is a yoke in which the contacts are snapped into place by the retention clip. The yoke is sealed by an outer shell which locks everything in place. Mr. Borsuk used a wrench to lock the subparts in place. In demonstrating how a connector half is assembled, Mr. Borsuk conceded that the closing tool was an Allen wrench, a standard hardware tool, even though he had previously identified the closing tool as being "unique." PX–3126F explains the procedure Mr. Borsuk followed in his demonstration during trial.

Plaintiff introduced evidence pertaining to items that plaintiff sold in connection with its fiber optic business. The items were not part of either a connector half or a completed connector cable assembly. Mr. Borsuk testified that unique dust covers were designed for plaintiff's connector cable assemblies. They could not be used with any other manufacturer's connectors. He also stated that government specifications for connectors required dust covers. He regarded dust covers as integral, since they were always sold tethered to a completed connector cable assembly. When asked by counsel to define his understanding of the word "integral," Mr. Borsuk responded: "To me it means that they work in cooperation together and they can't be used alone. And they have no function alone, they won't perform alone or perform individually unless the two are used together."

Mr. Borsuk also testified regarding tools sold in connection with plaintiff's fiber optic business.[5] There were tools and fixtures of unique design that were used in conjunction with the connector cable as-

semblies. The items he included in these categories were insertion/extraction tools used to insert and remove the pin contacts from the connector cavity. He also included a grinding and polishing tool which was used to prepare the face of the fiber for mating with another fiber. Other tools, such as the crimping tool, were used to prepare the cable for attachment of the strain relief.

According to Mr. Borsuk, because of the unique dimensions of the ITT and Hughes connectors, different unique tools were necessary to prepare and assemble connector cable assemblies. He stated that the AT & T and Hughes connectors, and therefore their tools, were completely incompatible with plaintiff's. In addition, Mr. Borsuk identified special tools used for bonding, crimping, and closing connector shells. He stated that all of the tools he described had no use other than their applications to plaintiff's fiber optic connectors. Mr. Borsuk did discuss a contact termination kit that was partially unique to MIL–C–38999, which could be used with either electrical or fiber optic contacts. Mr. Peterson's category part number listing identifies tools generally, without identifying tools that are unique.

Mr. Dollar, in the early to mid–1980's, worked for Hughes as a pricing analyst and later as a program administrator in Hughes' fiber optic business. He testified that some of the tools sold by Hughes to its customers were unique to Hughes' products and not compatible with ITT–Cannon or AT & T connectors. Mr. Dollar identified the tools that he considered specialized:

Cure fixtures, grinding/polishing fixtures, certain wrenches, some of the crimp tools. The jaws were set up for specific dimensions on the connector. I would say that the epoxies which were in there, although they could be available [through] . . . a different number of manufacturers, they would be chosen by

5. Mr. Borsuk testified only with regard to plaintiff's expectations in selling its own fiber optic products. Mr. Dollar, the former Hughes em-ployee, identified Hughes' specific expectations in selling its fiber optic products.

Hughes or by us or by whoever because they worked best with those particular connector styles.

According to Mr. Dollar, the specialized tools were sold for the most part in tool kits; however, his testimony revealed that these kits contained many fungible items. Plaintiff did not break out the price of specialized tools from its tool category. Plaintiff included the total price of the tool kits and all of the individual part numbers for tools, regardless whether they were standard or sold separately. Category 13, the assembly tool category, contains many different part numbers. Mr. Dollar testified that the majority of the cost of tool kits could be attributed to the specialized items. The court inquired of the witness about the grinding/polishing tools used with the Hughes contacts. Mr. Dollar's statements made it clear that the fixture, the device used to hold a contact in place when grinding and polishing, was specific to the dimensions of the contact, but the remainder of the apparatus had a utility apart from the Hughes contact.

Mr. Makuch also addressed the utility and fungibility of items sold by Hughes in connection with its sales of fiber optic connectors, components, and contacts. He identified cable as having a utility apart from the infringed connectors.[6] According to Mr. Makuch, a lot of other non-Hughes connectors would accept the cable, and cable could also be used with mechanical or fusion splices.

Mr. Makuch noted that assembly labor and termination labor charges appearing in the Hughes data could not be specifically applied against the infringed connectors.[7] Cooling, engineering, and fixturing charges were not provided just for the connectors containing the infringing devices. Mr. Makuch was asked on direct examination to testify whether assembly tooling "of the type in Category 13 of DX–4717 [was] only

functional with [fiber optic] connectors as depicted in PX–25, 29, 31 and 32." He testified that certain termination tooling and polishing fixtures may have been designed for use with the Hughes pin contacts. Mr. Makuch reviewed the items listed in the Hughes assembly tool kit to identify the tools of special design.

Mr. Makuch prefaced his testimony on assembly tools by identifying tools that he considered to be common to the industry. He identified as standard tools a cable stripper, hex wrench, exacto knife, carbide knife, lubricant, containers, and solvent and epoxy kits. These were items he classified as "not unique to the assembly of any product." Additional common items included screwdrivers, gauze pads, heat gun, cotton tip applicators, shears, and torque wrenches. He stated that the insertion tool "insofar as the Hughes contact is equivalent to a common electrical size of their other contacts that very likely could be used...." Other standard items included an optical microscope and phenalic and diamond polishing laps. The three devices were used in finishing the ends of fibers for mating. He considered polishing discs to be standard items.

Next, Mr. Makuch identified items that he considered possibly unique to the Hughes fiber optic connectors: contact broaches, connector tools for the different channel connectors, the alignment sleeve insertion/removal tool, and curing and polishing fixtures. Spare parts were classified as unique, as they were not identified specifically. He also viewed the polishing calibration tool as critical and unique to a particular polishing tool.

Mr. Makuch proved to be a more credible and persuasive witness than Mr. Borsuk on the issue of related sales. Mr. Borsuk, who, it will be recalled, provided key testimony in plaintiff's favor during the liability trial two and one-half years earlier, was

---

6. Although plaintiff makes no claim to cable as includable in the compensation base, cable supplied by Hughes was included in the category breakdown insofar as Hughes supplied the cable with connectors. The court has not discounted the price of connectors in order to reduce for this factor.

7. The infringed patents were not embodied in fiber optic connectors. However, as will be discussed, plaintiff is entitled to include in its compensation base connector halves under the entire market value rule.

evasive on cross-examination and failed in this trial to provide testimony as detailed and systematic as Mr. Makuch's. Mr. Borsuk attempted to portray all of the tools as unique, even though there existed a clear demarcation between unique and standard. Moreover, Mr. Dollar's testimony on this subject was not inconsistent with Mr. Makuch's.

Mr. Borsuk also testified concerning market conditions existing for fiber optic connectors during the period 1978 to 1984 and plaintiff's expectations for sales during this period. He stated that plaintiff expected "exponential growth" in the sale of its fiber optic products. He noted that his research indicated a compound annual growth rate of 50 percent for fiber optics. This opinion was based upon the predictions of research firms and articles he reviewed on the subject.

Mr. Dollar informed the court about plaintiff's and Hughes' expectations for sales and their marketing strategies. He also testified about Hughes' actual practices in the sales of its connector cable assemblies and related fiber optic connector products. In his capacity with Hughes as a pricing analyst for the products concerned, Mr. Dollar would perform "the pricing exercises to come up with the unit price for those assemblies or components." According to Mr. Dollar, Hughes sought a profit margin of 20 percent for its fiber optic connector products. He stated that Hughes sold comparable, although not compatible, products to plaintiff. He viewed Hughes' expectations for connected sales along with fiber optic connectors and components as similar to plaintiff's. Hughes, Mr. Dollar testified, also expected to sell dust covers, as well as related tooling, as part of its connector sales. However, Hughes' sales catalogue identifies dust covers and tools as optional items. Jack J. Maranto, Hughes' Marketing Manager for Fiber Optics, testified on deposition that Hughes sold connectors without dust covers and that there were applications for the Government in which dust covers were not used.

Shirley Ann Lawrence, a market research analyst at ITT–Cannon since 1978, presented plaintiff's forecast of the fiber optic market. Based on the actual growth rate of 1977–1978, she projected a 40 percent compounded annual growth rate for fiber optic connectors for 1978–1979 and projected similar growth over a five-year period. She repeated this analysis in 1981 yielding a projected growth rate "a cut above" the 1978–1979 rate. She made a retrospective analysis from 1987–1979 revealing a compound growth rate in fiber optic sales in all markets of 33 percent. The usefulness of this testimony was limited since the witness' analysis took the form of oral reports; there were no formal reports of her data; and the studies included the entire fiber optics market.

Plaintiff's projections are not consistent with Hughes' actual experience. The Hughes sales data showed a leveling off in the later years. Hughes experienced growth in sales after 1980 of approximately $500,000 per year until 1984. In 1984 sales increased in excess of $1,000,000. Thereafter, sales leveled off, with only small increases. In 1987 sales declined from the previous year. In 1988 the sales up to July 2 were substantially behind previous year totals. Finally, defendant's James H. Davis, Director of the Fiber Optics Programs Office of the Naval Sea Systems Command, who also testified in the liability trial, and whose responsibilities since 1986 have expanded to include participation in a tri-service fiber optics management panel, predicted a future decrease in fiber optics connector sales to the military due to economic and technological reasons.

Given the conflicting evidence on related sales, guidance must be sought from the case law as to what sales come within the entire market value rule. The infringed patents in *Tektronix* were directed to oscilloscopes and their electronic circuitry. The oscilloscopes had unpatented plug-ins that were required in order for the scopes to function, although they were not part of the scopes themselves. The plug-ins were dependent on the role of the scopes to create a market. The Court of Claims engaged in a three-part inquiry to determine

whether the "unpatented components" should be included in the compensation base. First, the court focused upon the interdependence of the scopes to the plug-ins, stating: "[I]t appears that the plug-ins are useless without the scopes and that the scopes require a plug-in before they have any utility...." 213 Ct.Cl. at 272, 552 F.2d at 351. Second, the court looked to whether the patented items created a market for the unpatented items. Finally, the court considered the activities engaged in by the seller to sell the unpatented items along with the patented device. The court concluded: "Plaintiff's patents were of such paramount importance that they substantially created the value of the plug-ins, and therefore the 'entire market value rule' applies." 213 Ct.Cl. at 273, 552 F.2d at 352 (citations omitted).

The machine in *Paper Converting Machine Co. v. Magna–Graphics Corp.*, 745 F.2d 11 (Fed.Cir.1984), was a mechanism for transferring paper products, *e.g.*, toilet paper, paper towels, from a "parent roll or bedroll ... onto paperboard cores to form individual consumer products." 745 F.2d at 13. The auxiliary equipment included a rewinder, which incorporated the patented item, and three auxiliary units. "[T]he mechanism for the high speed manufacture of paper rolls comprises several components, only one of which incorporates the invention claimed in the '353 patent...." *Id.* at 23. However, none of the auxiliary units were integral parts of the rewinder; they each had separate usage. The unpatented machines were included in the compensation base because they operated together to complete the process of creating finished consumer products.

■ Plaintiff's theory of related sales goes beyond the inclusion of "unpatented components" referred to in *Tektronix* and *Paper Converting*. Plaintiff relies on *Paper Converting* to support its view that the compensation base should include unpatented items that are not part of the actual physical hardware of the unit connected with the patented item. Plaintiff contends, in effect, that any item that is sold in conjunction with the patented item should

be included in the compensation base. Although *Paper Converting* included separate unpatented units in the compensation base, plaintiff, in seeking inclusion of all Hughes' fiber optic connector products and services, distends the Federal Circuit's reasoning. An unpatented item (for example, a tool) must have some functional relationship to the patented item (for example, a termination pin assembly) other than being sold in conjunction with an includable unpatented item (for example, a connector shell) that incorporates the patented item. The connection cannot be too attenuated. It is insufficient nexus to expect inclusion of a product that is related only to the integral unpatented item, but has no functional relationship to the patented item.

The Court of Claims expressed the view that limitations should be placed on the extension of unpatented items to be included in the compensation base. In *Bendix* the patent involved was a fuel metering control system. The patented device was attached to a "fuel control system," which, in turn, was attached to an engine to be installed in an airplane. The court determined that the unit for compensation base purposes would be the fuel control system, as installed, because it "is more nearly related to the value of the Mock invention [patented device] than the market value of the engines in which they were installed...." 230 Ct.Cl. at 255–56, 676 F.2d at 611. In order to avoid an excessive award, the court was concerned with the monetary impact of extending the unpatented items to be included in the compensation base. *See also Leesona*, 220 Ct.Cl. at 263–64, 599 F.2d at 975–76 (anodes, cathodes, and covers sold along with batteries as part of original procurement included in compensation base, but not when purchased as spare parts).

Defendant concedes plaintiff's entitlement to a compensation base inclusive of more than the sales price of the patented items. Defendant's category breakdown includes fiber optic connectors that contain the infringing devices and not merely the devices infringing the '182 and '797 patents standing alone. However, defendant asserts that the "patented/unpatented" unit

to be included in the compensation base begins with one half of a mated pair of a connector cable assembly containing pin contacts or an infringing strain relief. According to defendant, the inquiry should focus on plaintiff's licensing practices. Defendant argues that plaintiff should be limited to what plaintiff actually sought when exploiting its patents, since plaintiff, in exploiting its patents, did not seek to capture related sales. For example, unlicensed products and all of the services do not fall within the ITT/Hughes or ITT/Allied licensing agreements. Defendant thereby would limit plaintiff to no more than it actually bargained for in its license agreements with Allied and Hughes.

Defendant's position rests upon the assumption that plaintiff is entitled to obtain in the compensation base no more than what it actually licensed. Defendant does not rely only on the ITT/Allied and ITT/Hughes agreements as manifesting plaintiff's expectations for exploiting its patents. For example, defendant points to the fact that in an August 15, 1983 License Agreement between Hughes and Elco (the "Hughes/Elco agreement") and in another License Agreement of the same date between Hughes and Bendix (the "Hughes/Bendix agreement")—both covering comparable patents—finishing tool patents were listed as separately licensed patents. Therefore, defendant asserts that if plaintiff expected to receive royalty payments for tools, it should have included them in its licensing agreements, as it did its connectors.

Mr. Makuch testified convincingly as to defendant's approach. He identified the categories that would be includable if the parameters of the licensing agreements were used. Defendant presents a logical proposition, but it is unclear whether it would accomplish the objectives of the entire market value rule. The case law on the entire market value rule does not instruct that a patent holder's licensing agreements determine the parameters of the includable unpatented items. Instead, the law focuses upon the patent holder's sales and marketing expectations. The cases require a court to decide the degree

to which the patented items will be extended to include unpatented ones based on a showing by the patent holder of its actual expectations. Consequently, this court views the licensing agreements only as a factor in determining which categories would be includable.

*Paper Converting* included in the compensation base auxiliary units that were separate unpatented components, but were expected to be sold with the patented item as auxiliary equipment. In so holding, the court gave decisive weight to the patent holder's marketing expectations. The Federal Circuit explained:

> The deciding factor ... is whether "[n]ormally the patentee (or its licensee) can anticipate sale of such unpatented components as well as of patented" ones. *Tektronix, Inc. v. United States* [213 Ct.Cl. 257], 552 F.2d 343, 351, 193 USPQ 385, 393 (Ct.Cl.1977). If in all reasonable probability the patent owner would have made the sales which the infringer has made, what the patent owner in reasonable probability would have netted from the sales denied to him is the measure of his loss, and the infringer is liable for that.

745 F.2d at 23 (citation omitted).

■ The issue in the case at bar is whether items such as dust covers, tools, and services fall within the definition of "unpatented components" as intended in *Tektronix* and *Paper Converting*. This court does not read either case to require inclusion of these items. The cases as a whole extend the inquiry to those unpatented items necessary to make the patented device function, *i.e.*, give it value. Thus, the inquiry attempts to add to an apparatus those elements necessary to the patent's market value that the patent holder has an expectation of selling along with the patented items. Plaintiff's expectation of additional sales must relate back to the two patents and not to the unpatented sales. The inquiry should not extend to the universe of every item, no matter how attenuated its relationship to the patented item, simply because a patent holder can establish that it experienced related sales. If

the unpatented items are to be includable under the *Tektronix* and *Paper Converting* standard, the patent holder must establish its expectation of compensation for the additional items in marketing the patented ones.

Mr. Makuch provided an opinion about the meaning of the definitions contained in the ITT/Allied agreement. Mr. Makuch was familiar with the definitions. Based upon his review of the definitions and an assumption that the terms in the agreement referred to the '182 and '797 patents, he was asked whether the fiber optic connectors, components, and contacts contained in his part number analysis, DX–4717, were licensed products.

Mr. Makuch reviewed each category opining whether the category definitions were consistent with the ITT/Allied agreement definitions. If so, he was asked to identify what type of licensed product the given category would encompass—a fiber optic connector, a component, or a contact. Mr. Makuch gave specific reasons for his inclusion or exclusion of categories from the definition of licensed products. The following list reflects Mr. Makuch's judgments for all of defendant's categories:

| CATEGORY | LICENSED PRODUCT | TYPE |
|---|---|---|
| 1A | Yes | Contact |
| 1B | Yes | Component |
| 2A | Yes | Contact |
| 2B | Yes | Component |
| 3 | Yes | Component |
| 4 | Yes | Component |
| 5 | Yes | Component |
| 6A | Yes | Connector |
| 6B | Yes | Connector |
| 7A | No | * |
| 7B | No | * |
| 8 | No | * |
| 9 | No | ** |
| 10 | No | ** |
| 11A | Yes | Component |
| 11B | Yes | Connector |
| 12 | No | *** |
| 13 | No | **** |
| 14 | No | * |
| 15 | No | * |

\* Contains no features of the '182 or '797 patents

\*\* Labor charges/no hardware involved

\*\*\* Dust covers sold separately

\*\*\*\* Tooling

Although Mr. Makuch adopted plaintiff's definition of licensed products as the measure of plaintiff's expectations, he also addressed plaintiff's marketing expectations for selling related products. He segregated categories according to licensed products, concluding that if a category did not identify a licensed product applying the definition in the ITT/Allied agreement, it was not included in the compensation base. Mr. Makuch testified that Categories 1A, 1B, 2A, 2B, 3, 4, 5, 6A, 6B, 11A, and 11B were the only categories containing items that qualified as includable in the compensation base.

Mr. Borsuk testified to the value of connector halves standing alone. He stated that the goal in fiber optics was to establish a fiber-to-fiber link and this could be accomplished only with two halves of a mated pair. Defendant maintained that a connector half was the unit on which the court should focus. The court found Mr. Borsuk's testimony persuasive on this point. Although Mr. Borsuk's definitions are contrary to the testimony of every other witness (given Mr. Peterson's deposition testimony), the court finds that it is necessary to its function that the patented device is capable of mating. Moreover, defendant has conceded that more than the value of the '182 and '797 patents can be included in the compensation base.

The court agrees that plaintiff would expect to sell the entire unit that results in a fiber-to-fiber link. Categories 7A and 7B, although unpatented items, would be included in the compensation base because they are connector halves and connector cable assemblies built to mate with fiber optic connectors containing patented items. This is in accordance with both plaintiff's and Hughes' expectations reflected in a June 22, 1988 letter from Mr. Peterson to Mr. Szabo. The letter stated that the agreement "includes sales of both plug and receptacle connector halves, pin and socket contacts, and cable assemblies." Category 7A identifies connector halves containing socket inserts, which do not have features of Categories 3, 4, or 5, but which mate

with connector halves identified in Categories 3, 4, or 5. Category 7B identifies cable assemblies with the same characteristics.

Defendant's Category 12 identifies dust covers sold separately, which plaintiff claims should be included in the compensation base. Mr. Borsuk testified that dust covers always were sold in conjunction with plaintiff's connectors. Defendant agreed that to the extent dust covers were sold attached to connectors containing patented items, they should be included in the compensation base. However, dust covers sold separately should not be included.

Plaintiff's expectation was that it would sometimes sell the dust cover tethered to its fiber optic connectors. Mr. Dollar conceded on cross-examination that dust covers were not always sold this way. The ITT Assembly Products catalogues also identify dust covers as optional items. Dust covers were not indispensable to the function of all the items containing devices that embodied one or more of plaintiff's patents. Plaintiff's marketing expectation was that dust covers ordinarily would be sold in conjunction with its connectors; to the extent this expectation was realized, dust covers are included in the compensation base. Dust covers sold separately as "spare parts" or "replacements" are not included. Although Hughes did experience actual sales of additional dust covers, plaintiff did not establish that it expected to sell dust covers with every connector assembly. Defendant demonstrated that it was not always necessary or customary for dust covers to be purchased.

Defendant's Categories 9 and 13 identify, respectively, "Non–Recurring Charges for Tooling, Engineering, and Fixturing" and "Assembly Tooling for Sale." A great deal of trial time was spent on the subject of tools. Plaintiff's witnesses Messrs. Borsuk and Dollar viewed plaintiff's and Hughes' tools as unique. The tools were necessary for the assembly and termination of their respective fiber optic connector components. The uniqueness of the tools is not the most important factor, except to the extent that uniqueness contributes to plaintiff's expectation that it would sell tools along with its fiber optic connector components. That plaintiff would have experienced Hughes' actual sales is not relevant to this inquiry. It is plaintiff's expectations and not Hughes' actual experience on which the court should focus. *Tektronix*, 213 Ct.Cl. at 272, 552 F.2d at 351.

Mr. Borsuk testified that plaintiff expected to sell its unique tools because the tools were necessary to those companies and contractors that purchased components. Mr. Borsuk specifically considered certain tools unique to plaintiff's connectors. He identified certain unique tools on direct examination. On cross-examination Mr. Borsuk retracted his testimony as to two of these tools, namely, the epoxy which he admitted was common, and a closing mechanism, which he conceded was a standard Allen wrench.

Mr. Dollar testified that Hughes' expectation was to sell assembly tool kits that included both unique and standard items. He stated that the "big ticket" items were the unique tools. However, on cross-examination, he admitted that items he identified as unique, in fact, were standard. For example, Mr. Dollar conceded that only the polishing fixture, and not the more expensive polishing tool, was unique. The Hughes catalogue supports this view, identifying only the fixture as a patented item.

Uniqueness is not the qualifying feature, but the court is troubled by plaintiff's attempts to bootstrap unpatented standard items into the compensation base. Plaintiff must demonstrate that it expected to sell assembly tool kits with its fiber optic connector component packages. Plaintiff's catalogue breaks out the different tools offered for sale; therefore, its expectation was not to always sell entire tool kits. Defense witness Makuch testified that many of the items in the tool kit were fungible, making it unnecessary to purchase the entire kit from plaintiff. Category 9 was a testing category. Category 13 identifies assembly tooling. Mr. Makuch testified as to the tools in plaintiff's tool kits that he considered unique. He identified a number of tools. However, three factors detracted from the inclusion of

tools or tool kits in the compensation base. Mr. Makuch testified that in his experience a company would not expect to make a profit on the sale of tools. Instead, a company would look to break even when selling its tools. Second, the tools were identified as being sold separately in Hughes' sales catalogues. Specifically, PX–4302, under the heading "Assembly Tools and Kit" contains the following: "All tools are available from stock and are sold independently." Finally, some tools that were identified by Mr. Borsuk as unique were useful only to items unrelated to patented devices. For example, plaintiff sought to include in the compensation base an insertion/extraction tool used with the alignment sleeve, *i.e.*, the '145 patent, which the court found not to be infringed.

A number of other factors detracts from plaintiff's position. The fact that the military requirements of the Defense Logistics Agency specify only insertion tool, removal tool, alignment sleeve tool, and polishing fixture tool, with specific part numbers provided for these devices, prompts the finding that plaintiff could not have the expectation of selling all of the tools and that its category is overinclusive. Category 13 covering assembly tools also includes many part numbers that could have been traced back to each part number's corresponding devices. Hughes "C–21 Environmental Connectors" sales catalogue and its "Engineering and Production Data Control Part Master Data Report" identify tools for sale by individual part number. Plaintiff's "FOSC [Fiber Optic Single Channel] Plug Termination/Assembly Procedure" also identifies individual tools to part numbers and represents that tools may be purchased separately or as a contact termination kit. The kit is sold under a specific part number. The court notes that plaintiff's assembly procedure catalogue for hybrid contacts identifies tools that meet standards in the MIL–C series of government specifications. One of the few tools that was not identified as meeting military standards was the insertion/extraction tool. However, this was only called for in plaintiff's "FOMC 6 and 8 Channel Optical Contact Termination and Connector Assembly Procedure."

The evidence supports the finding that plaintiff may have had an expectation of selling some tools in conjunction with the sale of its fiber optic connector components. However, plaintiff has failed to meet its burden by establishing its actual expectations. Plaintiff cannot lump all tools into a single category and expect to receive the benefit of their total inclusion.

Plaintiff bears the burden of establishing its entitlement. *See Bendix*, 230 Ct.Cl. at 257, 676 F.2d at 611 ("[T]he compensation base cannot be increased to accommodate a speculative and unproven amount...."). Plaintiff has engaged in a tactic of overinclusion, which runs the risk of the exclusion of possibly legitimate items, since the court cannot attribute a dollar value to these items. Plaintiff, in its approach, did not argue that it legitimately expected to sell all of its tools, but instead argued for unique tools, which of necessity were sold with its fiber optic connector products. However, plaintiff made no attempt to segregate these unique items, establish their relationship to the patented devices, and then attribute a dollar value to them. Plaintiff did create three tool Categories 9T, 9E, and 9F, but there was no segregation of unique items within these categories. Instead, plaintiff relied on Mr. Dollar's bare assertion that the unique tools were the big ticket items, a point refuted by defendant on cross-examination and by the direct testimony of Mr. Makuch.

Defendant also excluded Category 8 covering prototypes and experimental devices. Mr. Makuch excluded these devices from the compensation base because they were not shown to contain any features of the '182 or '797 patents. This is significant, not only because the category would be excluded under the ITT/Allied definition, but also since plaintiff's expectation could not be to link the sale of these remote items to the sale of its patented products.

Category 10 was captioned "Labor Only" charges. Mr. Makuch was of a view that these charges should be excluded, because

they were not actual hardware. Mr. Peterson testified that he assumed that Hughes had merely broken out its charge for assembling connectors in some instances. Since a charge for assembly was ordinarily included in the price of connectors, he included the labor costs in the compensation base.

On cross-examination Mr. Peterson admitted that termination charges were for cancellations and not specifically identified to a product. The court finds that these charges should be excluded because plaintiff has failed to meet its burden of proof of tying these charges into the sale of its patented items. A seller does not ordinarily expect to incur a monetary benefit from cancellations. Plaintiff would expect only to recoup the money spent on its effort and to exact a penalty on the purchaser. It would not expect to obtain a profit from a cancellation. To the extent that there may have been includable items, the court has no means for breaking them out.

Plaintiff's representation by counsel that sometimes labor was included in the charge for connectors and sometimes it was not is not evidence. Mr. Peterson, plaintiff's witness, could not explain why these charges were split out. Plaintiff made no attempt to present evidence, through use of the part numbers and price lists, to explain how this phenomenon was reflected in lower charges for certain connectors. Instead, plaintiff relied on an assumption that this labor was associated with patented products and was broken out of the price for certain connectors. The court has insufficient basis for accepting plaintiff's representations. Therefore, Category 10 is properly excluded from the compensation base.

Category 14 is entitled "Piece Parts." Mr. Makuch excluded these items because on his review they did not contain the '182 or '797 patents. They would not be includable under the ITT/Allied agreement. He also stated that they were not ready to be sold or to be assembled into fiber optic connectors. The court views this piece part category as spare parts, from which plaintiff would not expect sales in conjunction with the patented items. Subsequently experienced sales do not identify plaintiff's expectations. Therefore, Category 14 is excluded from the compensation base.

Category 15 is designated "Electrical Connectors, Couplers, SMA–SMA Assembly, Non–Hughes Devices and Other Miscellaneous Items." Mr. Borsuk testified that these electrical devices were adapted to be used for fiber optic products. Mr. Makuch was particularly persuasive on this category. He stated that the '182 and '797 patents were not identified as being included in these items. Mr. Peterson stated on cross-examination that electrical connectors should not be included, since only C–21 environmental connectors would accept optical contacts. He did not know if he had included other electrical connectors in this category. Mr. Peterson also stated that he did not know personally whether "T" and "Star Couplers" accepted pin contacts. On cross-examination plaintiff attempted to elicit testimony from Mr. Makuch that its "T" and "Star Couplers" were for fiber optic use. Mr. Makuch disagreed, asserting that the items were for electrical use.

Plaintiff's witnesses were not persuasive on this subject. Although its methodology attempted to capture all of Hughes' fiber optic sales, plaintiff did not present sufficient evidence to support the includability of particular items in the compensation base under the legal standard requiring sales of unpatented items be tied into expectations for sales of items containing devices that infringed the '182 or '797 patents. Instead, Messrs. Borsuk and Dollar testified generally about plaintiff's and Hughes' fiber optic marketing practices and sales history. The statement in deposition of Hughes' engineer Mr. Moulin that the '182 termination pin assembly is universally used in Hughes' connectors does not forge the linkage requirements of the case law. The court appreciates the difficulty plaintiff confronted in using a third party's sales information. However, this does not relieve plaintiff from justifying its marketing expectations with evidence, especially when it is vying for the inclusion of associated sales.

### 4. *Hughes' total sales*

Plaintiff urges that Hughes' total sales for government end use of fiber optic connector products for the years 1978 to 1988 should be the compensation base that the court adopts.[8] Plaintiff views this as only a partial measurement of the entire value of its connector products as installed. Plaintiff's base reflects sales by Hughes of fiber optic connectors, components, and contacts, as well as related products and services. According to plaintiff, the related products and services were "integral" to Hughes' fiber optics market sales. Therefore, under plaintiff's interpretation of the entire market value rule, all Hughes' sales for government end use are includable in the compensation base.

According to plaintiff, Hughes' sales for its fiber optic products during the period 1978–1988 totaled $19,480,550.00. The total figure reflects $200,000 in sales for the years 1978–1979, which amount is unsubstantiated, but plaintiff claims was represented to be the figure set by Hughes in the settlement agreement between plaintiff and Hughes of January 1, 1987, following the July 25, 1986 liability decision in this case. $334,676.41 for the year 1980 is reflected in the Hughes monthly income statements. $18,945,873.59 for the years 1981–1988 is substantiated by the Hughes sales recaps. No sales recaps exist for the years 1978–80. From this total figure plaintiff culled $200,000 for commercial sales made prior to January 1, 1987. $346,-556.09 was deducted for commercial sales for the period April 1, 1987, through June 30, 1988. This amount was derived from Hughes' royalty reports to plaintiff. Sales to plaintiff and its licensees also were deducted. These sales totaled $2,250,675.40. Plaintiff contended that the applicable compensation base, after the above reductions, was $16,683,319. The figure represented the total sales by Hughes to the Government of Hughes' fiber optic connector products and services, less commercial sales and sales to plaintiff and its licensees.

Ms. DiMatteo, the legal assistant to plaintiff's counsel, testified that the Summary Chart, PX–3114, was formulated through a comparison of the Hughes sales recaps to plaintiff's computer printout. Plaintiff's computer printout came within a few dollars of the Hughes sales recaps. The exception was for the year 1981, which showed a $6,000 disparity. Ms. DiMatteo reconciled the disparity by adding the subtotals that appeared in the Hughes sales recaps for 1981. The total that Ms. DiMatteo obtained came within a few dollars, satisfying her that the error had taken place in calculating the subtotals.

Ms. Stulberg, the computer manager for plaintiff's counsel, testified that she supervised the input of the Hughes sales data into the firm's computer so that a calculation could be made. After the input was completed, Ms. Stulberg testified that Mr. Peterson's category listing was used to obtain subtotals and totals for each category. The part number list was also used to identify sales to plaintiff and Bendix Corporation. The totals were then subtracted from the Hughes sales data to obtain the total sales base for government end use.

Mr. Ekholm, who managed this data processing project for defendant's contractor, was asked to testify about the data bases that he created for defendant. Mr. Ekholm was tasked with creating a data base that would capture the sales information provided by the Hughes sales recaps. Two data bases were created from the information provided. Mr. Ekholm referred to one as the "recap data base." A second "bookings data base" was created from Hughes' sales orders. Mr. Ekholm testified that, based upon defense counsel's instructions, he only attempted to capture part numbers, descriptions, unit prices, quantity amount as listed, and customers' names. The data bases were designed to perform a root search that would pick up anything following the original part number. Part numbers were standardized before they were input.

---

**8.** All references to government end use signify that sales to plaintiff's divisions and licensees, as well as commercial sales, have been removed.

Mr. Ekholm testified to the process he engaged in to ensure the accuracy of defendant's data base:

A. We went through a multi-step process whereby a key manual was developed to instruct the keyers how to pick up information off of the forms, exactly what information to pick up and what not to pick up. The information was keyed. Printouts were generated.

Printouts were taken and a one hundred percent quality control check was done by an independent group. Corrections were noted on the printouts, sent back to keying shop, subsequently corrected. A new printout was generated from which corrections were checked. Once corrections were made and finalized, a magnetic tape was generated.

And then the whole process began again. We double keyed and we went through the entire process once again. And in this way, we insured, once we got two magnetic tapes.

We loaded that data onto the Justice computer and we ran comparison programs which checked character by character does it look exactly like what's on the other set of data.

And when we had resolved all of the discrepancies, we loaded our [data base].

Mr. Ekholm stated that his objective was to ensure that the information was as accurate as possible. This was accomplished by accepting at face value the information that he was attempting to capture. No attempt was made to reconcile the information that was picked up with the "summed numbers" appearing on the reports. He stated that the structure of the data base was kept simple and objective. Subjective decisions were avoided.

In an attempt to refute plaintiff's contention that it expected to sell all of its fiber optic connector products together, Mr. Ekholm performed a "frequency search" of the Hughes bookings data base. A frequency search is used to determine the number of times a particular part number appeared in the bookings data base. He testified that he would not be able to accomplish the same task on the sales data

base. The search was used to determine the number of times the part numbers for pin contacts appeared alone or with other part numbers. The same type of search was performed for socket contacts and dust covers. Mr. Ekholm testified that pin contacts and socket contacts appeared alone roughly one third of the time. Dust covers were shown to be sold alone about half of the time. Defense counsel stated that because of the proximity to trial when this task was begun, Mr. Ekholm was unable to complete the frequency search for all of the fiber optic products.

Mr. Ekholm testified regarding the summaries that were created from the Hughes sales data. A summary from the bookings data was used for 1978–1980. Mr. Ekholm testified that two totals appeared in the documents, a line item total and a computed total. He viewed the computer total as more accurate because it reflected the quantity of the part number sold multiplied by the unit price. The sales total captured the totals as they appeared in Hughes' sales data. Bookings to plaintiff's divisions and licensees were deducted from the total of all Hughes' sales bookings.

Mr. Ekholm's report was broken down by categories containing part numbers with dollar values attributed to the part numbers. A cover page was created reflecting yearly totals from net bookings contained in the underlying data. A similar task was accomplished for the years 1981–1988, save that the Hughes sales recaps were used. The report reflected Hughes' total sales. Sales to plaintiff's divisions and licensees were deducted to reach a Hughes net sales figure. A computed value reflecting the same information was also obtained. The computed value was $1,104,794 less than the listed sales value, with the largest disparity occurring in 1984. Mr. Ekholm attempted to ascertain the reason for the disparity. He testified that the discrepancy had been thought to have come from a negative quantity having been multiplied by a positive unit price to yield a positive line total.

Upon review of defendant's data base, Mr. Ekholm believed that double account-

ing was also a cause. It was discovered that some part numbers appeared in more than one category causing the category totals to be higher than the computed total for all categories produced by the computer. The computer would only pick up the part number and calculate it once on its running total for all categories. The category totals were independent of the running total. Mr. Ekholm stated that the totals for the sales categories in DX–4835– 4836 were reflected in the sales column in DX–4837A. This exhibit was used by Mr. Ekholm to calculate the total sales multiplied by the royalty rates.

The court had great difficulty in identifying the most correct Hughes sales figure to provide a starting point. Both plaintiff and defendant attempted to capture the same data, but each came to a different result. Defendant's own calculations wrought different results for total sales and computed total sales. Defendant's total for Hughes' sales for government end use is $16,801,-327. Plaintiff's total sales figure for government end use is $16,683,319. The problem lies not with the disparity in the amounts, but in the parties' presentations of their respective figures, since plaintiff does not provide a breakout by category per year as does defendant. A second problem inheres in the fact that plaintiff attributes more sales than does defendant to the years 1978–1980, which is significant if prejudgment interest is to be compounded. The court will examine each problem separately.

5. *Adjustment to compensation base*

Mr. Makuch proved to be an unflappable witness. He identified a systematic approach to the classification of part numbers. Plaintiff's inability to undermine his categorization methodology leads the court to find that DX–4717 reflects the most accurate classification of part numbers available. Plaintiff's over-reliance on the data in the Hughes computer runs and defense counsel's ability to undermine Mr. Peterson's effort requires that plaintiff's part number listing not be adopted. Defendant's cross-examination of Mr. Peterson underscored two points. First, it became obvious from the comparison of drawings with the corresponding part numbers that the computer-generated information was not always accurate. Second, it established the foundations of Mr. Makuch's methodology and approach as fundamentally sound. The court has great confidence in Mr. Peterson's abilities and finds that he made a genuine effort to categorize accurately the information. However, defendant availed itself of additional information, thereby instilling greater confidence in defendant's final part number listing.

With respect to the first problem, PX–3114 entitled "Summary Chart of Hughes Sales" presents only yearly total sales figures. PX–3117 entitled "Summary of Hughes 1981–1988 Invoice Sales by Category" displays total sales for each of the categories in Mr. Peterson's analysis. The former exhibit is inadequate, since it does not identify the amounts to categories that comprise the yearly sales. The latter exhibit is also inadequate, since it provides no means for disallowing categories. Plaintiff takes the position that the court could eliminate in PX–3117 categories that do not qualify for inclusion in the compensation base; but this approach would not attribute dollars within each category to years, *i.e.*, it does not provide category totals broken down by year. Therefore, compound interest could only be on a total base for all the years in suit or to total sales by category not assigned to years. Either alternative is an unacceptable solution.

The second problem concerns the Hughes sales for 1978–1980. Defendant's evidence was presented broken down by year and category. DX–4835 and 4836 display the total sales figures that defendant proposes. Defendant used the Hughes bookings data base (sales orders) to derive its total sales figure for the years 1978–1980. Defense counsel proffered that Hughes could have no more sales than it had bookings. In addition, defendant asserted that to the extent that bookings were not converted into sales between 1978–1980, plaintiff would receive the benefit of double-counting in the later years on the actual sales of the booked items. Defendant's assessment

makes sense. However, no evidence was presented reflecting this trend.

Plaintiff argued that Hughes had represented that it had experienced $200,000 in sales for the years 1978–1979. Hughes had sales of $334,676 for 1980, which were reflected in Hughes' 1980 income statement. Defendant's figure for 1980, based upon Hughes' bookings, is $159,119.

In order to reconcile the dollar differential between plaintiff and defendant's sales data, the court has made adjustments to the figures. Neither plaintiff's or defendant's sales figures are adopted. A court is not required "to accept as dogma one of the parties' figures or the others, but can use them as perimeters for [its] ultimate determination." *Leesona*, 220 Ct.Cl. at 258, 599 F.2d at 972 (citations omitted). The court accepts plaintiff's representation that the years 1978–1980 accounted for more sales than defendant included in its breakdown. This is justified by the deposition testimony of Hughes' legal, sales, marketing, and engineering personnel, who support plaintiff's contention that plaintiff expended great effort in trying to extract from Hughes the most cogent sales information. However, plaintiff presented no category breakdown for these sales. In order to capture the dollar value in the earlier years attributable to includable categories, the following formula was adopted:

Formula: $\dfrac{A}{B} = C\% \times D = E$

*Table*

A. Defendant's yearly total for individual category.

B. Defendant's total figure for all categories for 1978–1980 ($390,704). For the years 1981–1988 ($16,410,623).

C. Percentage of category to total of all categories' sales.

D. Plaintiff's total sales figure for 1978–1980 ($534,676). For the years 1981–1988 ($16,149,319).

E. Total value of plaintiff's sales per category.

This formula gives plaintiff more dollar value included in the earlier years' total sales base, but retains defendant's breakdown of part numbers to particular categories. Plaintiff's failure to present its evidence in a manner enabling assignment of sales to categories necessitates that defendant's part number breakdown be used. No determination has been made whether plaintiff would receive more dollars for later years if the adjustment were not made.

To offset the increase to plaintiff's compensation base for 1978–1980, an adjustment was required for the years 1981–1988. To accomplish this result, $534,000 was subtracted from $16,683,319, which were Hughes' total sales for government end use. The resulting $16,149,319 was then used to fix the ratio of sales in the later years to defendant's part number/category breakdown. The same formula for 1978–1980 was utilized. Appendix I to this opinion shows how the adjustment was made, as an example, to Category 1A.

The percentages, which the court will refer to as the "adjustment factor," retain the same part-number-to-dollar-value that defendant created, except to the extent that sales dollars have been moved to earlier years. However, to the extent that sales dollars that were moved are not reflected in categories included in the compensation base, they were eliminated. Plaintiff is not entitled to inclusion of all of the earlier sales dollars in the compensation base. Plaintiff had the burden of presenting its evidence in a manner that can be used by the court. Plaintiff's presentation, in a year-by-year fashion without the corresponding category breakdown by year, prevents the court from adopting any of plaintiff's iterations. Plaintiff knew prior to trial that categories could be excluded from the compensation base. Therefore, plaintiff should have been aware that its presentation did not accommodate any yearly adjustments.

The court has great confidence in defendant's part number categorization. The court has made an adjustment to defendant's presentation only because defendant could not disprove plaintiff's assertion that Hughes experienced the amount of sales that plaintiff claims in the earlier years.

Given that plaintiff and defendant submitted conflicting evidence of equal probative value, the changes are justified since plaintiff was not responsible for the Hughes sales information. However, adoption of defendant's part number breakdown is the only way to accomplish a fair accounting. The part numbers for 1978–1980, even though derived from bookings, are the best evidence of the percentages of sales dollars attributable to individual categories.

The court has devised the fairest method for providing plaintiff the value it seeks in the earlier years without giving plaintiff a windfall. Plaintiff should not benefit from its own lack of specific proof when there is evidence in the record on the nature of Hughes' sales during the years 1978–1980, which could have enabled plaintiff to break out sales and charges that are not includable in the compensation base. *See Dynamics*, 5 Cl.Ct. at 616 (sales unsupported by evidence not includable in accounting).

## II. Royalty rate

■ In determining the royalty rate to be applied to the compensation base in a section 1498 setting, "the court is attempting to establish a royalty which will adequately compensate the patentee for his loss...." *Dynamics Corp. of America v. United States*, 5 Cl.Ct. 591, 606 (1984), *aff'd in part, rev'd in part, and remanded on other grounds*, 766 F.2d 518 (Fed. Cir.1985). The focus of this inquiry is on the date when the infringement began. *Decca, Ltd. v. United States*, 225 Ct.Cl. 326, 336, 640 F.2d 1156, 1167 (1980), *cert. denied*, 454 U.S. 819, 102 S.Ct. 99, 70 L.Ed.2d 89 (1981). A court should look to existing licensing agreements. *Calhoun v. United States*, 197 Ct.Cl. 41, 55–56, 453 F.2d 1385, 1393–94 (1972). The Court of Claims stated in *Tektronix, Inc. v. United States*, 213 Ct.Cl. 257, 265, 552 F.2d 343, 347 (1977), *cert. denied*, 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978), "Where an established royalty rate for the patented invention is shown to exist, that rate will usually be adopted as the best measure of reasonable and entire compensation." (Ci-

tation omitted.) However, "where no such royalty is shown, alternative methods must be employed." *Id.* The royalty comparison approach is the preferred methodology. *Leesona Corp. v. United States*, 220 Ct.Cl. 234, 259, 599 F.2d 958, 973, *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). To accomplish this task, a hypothetical negotiation between a "willing buyer and willing seller" may be used, *TWM Manufacturing Co. v. Dura Corp.*, 789 F.2d 895 (Fed.Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986), centering on the date the infringement began. *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075 (Fed.Cir.1983); *Dynamics Corp.*, 5 Cl.Ct. at 606. However, this analysis "permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known or predicted by the hypothesized negotiators." *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed.Cir.1988).

### 1. *Licensing agreements covering the patents in suit or comparable patents*

Mr. Peterson discussed plaintiff's licensing history and practices. He read into the record the definitions of the compensable products under the ITT/Hughes agreement. These definitions, which were quoted *supra* at p. 207, cover fiber optic connectors, components, and contacts, as the licensed products to which the royalty rate is to be applied. Under the ITT/Hughes agreement, fiber optic connectors bear a 5 percent royalty rate; components, 10 percent; and contacts, 8.5 percent. Mr. Peterson was the proponent for royalty rates reflecting the ITT/Hughes rates, but he offered no analysis beyond identifying the ITT/Hughes agreement for the established rates. He took the position that the ITT/Hughes rates should apply to connector cable assemblies.

According to Mr. Peterson, under the ITT/Allied agreement, which also covered the '182, '797, and '145 patents, Allied made royalty payments for connector cable assemblies. As the agreement defined a fiber optic connector as a "connecting device

for joining or fastening together one or more optical fibers or cables," including "any device which in addition to joining together optical fibers also performs some other connecting or other function," Mr. Peterson testified on deposition by defendant that a connector would include a connector half, as well as two mating halves sold together for mating with each other. His trial testimony equated a connector half with a connector.

Defendant contended that the applicable royalty rates should be the rates in the ITT/Allied agreement. The ITT/Allied agreement contained a royalty rate of 2.5 percent for the '182 patent used alone, a rate of 2 percent for the '797 patent used alone, and a rate of 3 percent when the '182 and '797 patents were used together. The rate would be doubled if the patents were sold as components. Defense witness Paul M. Enlow, who was qualified as an expert in patent licensing, posited that the ITT/Allied agreement represented the only license agreement that was freely and willingly negotiated. As noted above, *see also supra* note 3, this agreement, effective on August 1, 1985, was consummated several months before the liability trial. The ITT/Allied agreement sublicensed, through Allied, Bendix Connector Operations; Amphenol Products, a division of BunkerRamo–Eltra Corporation; and three other named fiber optic licensees of Allied. Indeed, plaintiff touted the ITT/Allied agreement in the liability trial as evidence of its patents' commercial success. *See ITT Corp.*, 10 Cl.Ct. at 379. Mr. Makuch viewed licensed products under the ITT/Allied agreement as restricted to products including a pin contact or strain relief. Mr. Enlow's analysis applied the ITT/Allied rates accordingly.

Mr. Enlow explained his approach in rendering his opinions on the applicable royalty rates. He reviewed the infringed patents along with deposition testimony. He also applied his knowledge of the status of fiber optics when the taking began in 1978. He reviewed the licensing activities of plaintiff in this area by looking at several agreements and proposals. Mr. Enlow considered the ITT/Allied and ITT/Hughes agreements, as well as licenses and proposals by both plaintiff and Hughes covering comparable patents. Mr. Enlow prepared a chart entitled "Summary of Royalty Rates Re Fiber Optic Connectors and Components," DX–4838, listing seven agreements or proposals by Hughes or plaintiff, three of which dated from 1983 and the most recent, the ITT/Hughes agreement, entered into in 1987. Based upon all of the information he reviewed, he concluded that a reasonable royalty rate would be in the 2–3 percent range consistent with the ITT/Allied agreement.

Mr. Enlow, a patent attorney who holds a master's degree in business administration, formed his opinion partially on his personal experiences. He served for 16 years as a patent attorney for AT & T, ultimately as Vice President and Assistant General Counsel, participating in more than 1,000 licensing agreements, some of which were in the fiber optics area. He worked for three other major corporations as a patent attorney. Since 1985 he has consulted, *inter alia*, as an expert witness.

Mr. Enlow testified that it was the practice of AT & T and other corporations, including plaintiff, to renegotiate licensing contracts after a short period of time. Renegotiation is driven by "[c]hanges in various industries, changes in the importance of them, changes in the patents that people held...." Initially, Mr. Enlow in referring to a patent holder stated: "[Y]ou have no idea what the value of the patents are, and then as the industry matures, you begin to realize that some of the patents you have do have some value...."

The ITT/Allied agreement, in his view, was the best indicator of established royalty rates:

Well, as I mentioned before, it was freely entered into by both sides. It started from a request by Bendix to IT & T for a license and this is what culminated from it. It also is useful for the royalty rates it states, and it's also useful for the fact that the definitions in the agreement were in fact drafted by IT & T, so it seems to me they would be

definitions which in this proceeding, IT & T would be happy to adopt.

In April 1983 plaintiff made its first proposal to Hughes involving the patents in suit. Plaintiff's 1983 proposal called for a royalty rate of 10 percent for the use of three patents, 7.5 percent for the use of two patents, and 5 percent for the use of one patent. The proposal had no provision for doubling the rates if devices covered by the patents were sold as components. Mr. Enlow testified that in his experience the proposed rates were high given that connectors were a "commodity item." A letter of April 29, 1983, to plaintiff from Hughes' patent counsel Joseph E. Szabo indicates that Hughes had reservations about entering into an agreement, but not specifically about the proposed royalty rates.

Mr. Enlow discussed the royalty rates that Hughes obtained for two licenses granted on August 15, 1983, to the Elco Corporation ("Elco") and to Bendix Corporation ("Bendix"). The agreements were entered into to provide second sources for the Hughes connectors and to transfer technical information. Both agreements contained royalty rates of 6 percent for hermaphroditic connectors and 4 percent of the net selling price for all other connectors. Mr. Enlow considered that the primary purpose of the agreements was to transfer technical information. Therefore, he attributed one half of the royalty to the patents. He concluded that the resulting rate would be in the 2–3 percent range. According to Mr. Enlow, the transfer of technical information exacts a higher royalty rate. Comparatively, he viewed the Hughes, Elco, and Bendix agreements as in the same "ball park" as the ITT/Allied agreement.

A January 10, 1984 proposal from plaintiff to Hughes provided for a 3 percent royalty rate for use of fewer than three patents. A 20 percent discount was included for sales for government end use. Therefore, the effective rate would be 2.4 percent for the '182 and '797 patents. Plaintiff's proposal was not accepted.

Again, Mr. Enlow stated that the rates were significant because they were in the same "ball park" as the ITT/Allied agreement.

On March 29, 1984, plaintiff made a proposal to Bendix setting forth a royalty rate of 3.5 percent for use of fewer than three patents and a 10 percent rate for contacts standing alone. Plaintiff's proposal to Bendix also contained a 20 percent reduction for government end use, yielding effective royalty rates of 2.8 percent and 8 percent, respectively. Mr. Enlow's opinion was the same as with respect to the prior agreements. Plaintiff's proposal to Bendix eventually was negotiated into the ITT/Allied agreement. Although Bendix had approached plaintiff seeking a license, plaintiff ultimately was responsible for the terms of the proposal, according to the deposition of Michael J. Cronin, plaintiff's Director of North America Licensing & Litigation, who negotiated the agreement for plaintiff.

The final royalty rates that Mr. Enlow considered were the rates contained in the ITT/Hughes agreement of September 1, 1987, providing for rates of 5 percent for connectors, 8.5 percent for contacts standing alone, and 10 percent for components. However, he discarded the ITT/Hughes agreement for two reasons. First, it was late in time relative to the 1978 taking date. Second, Mr. Enlow viewed the ITT/Hughes agreement as having been entered into under threats from plaintiff.[9] He referred to a letter dated May 30, 1986, from Mr. Cronin to Mr. Szabo, stating: "To continue naked violation of our patents will subject Hughes to triple damages and attorney fees under the Patent Act."

Based upon the information Mr. Enlow reviewed, he assigned the royalty rates to be applied in fixing a reasonable royalty to the specific categories Mr. Makuch had included in the compensation base. Mr. Enlow concurred in Mr. Makuch's application of the definitions in the ITT/Allied agreement. However, he confined his review to the categories Mr. Makuch included in the

**9.** Mr. Enlow testified that plaintiff had made two additional proposals—one to Elco Co. and one to G & H Co.—both of which were rejected. Neither proposal contained royalty terms.

compensation base and not Mr. Peterson's categorization. Mr. Enlow assigned the following royalty rates, adjusted for the type of products and combination of patents, as stipulated in the ITT/Allied agreement:

| CATEGORY | TYPE OF LICENSED PRODUCT | ENLOW ROYALTY RATES |
|---|---|---|
| 1A | Contact | 5%* |
| 1B | Component | 5%* |
| 2A | Contact | 5%* |
| 2B | Component | 5%* |
| 3 | Component | 5%* |
| 4 | Component | 4%* |
| 5 | Component | 6%* |
| 6A | Connector | 2.25% |
| 6B | Connector | 3% |
| 11A | Component | 5%* |
| 11B | Connector | 2.5% |

\* 3%, 2%, 2.5% rates doubled for contact and component sales.

Mr. Enlow explained how he applied specific royalty rates to categories. Category 1A was 2.5 percent doubled, because it contained the '182 patent sold alone. Contacts were treated as components under the ITT/Allied agreement. Category 1B similarly was classified and carried the same 5 percent rate.[10] Mr. Enlow testified that categories 2A and 2B could contain the '182 and '797 patent individually or in combination. Since both categories required a doubling of the royalty rate, Mr. Enlow concluded that the value of individual patents created a possible 4–6 percent range under the Allied definitions. Therefore, he adopted 5 percent, which was a middle value.

Mr. Enlow concluded that Category 3 required a 5 percent rate since it included components containing the '182 patent standing alone. Category 4 was for strain reliefs standing alone or sold in connector components, and a rate of 4 percent was applied. Category 5 called for the '182 pin contacts and '797 strain reliefs used in combination and sold as components. Mr. En-

low applied a 6 percent royalty rate (3 percent doubled).

Categories 6A and 6B were identified by Mr. Makuch as connectors. 6A connectors could contain either '182 or '797 patents, but not both. Mr. Enlow again applied a middle value between 2 and 2.5 percent, arriving at 2.25 percent for category 6A. Category 6B identified connectors that contained both the '182 and '797 patents. He concluded that a 3 percent royalty rate was applicable.

The final categories that Mr. Enlow addressed were 11A and 11B. Category 11A included components using only the '182 patent. Therefore, a rate of 2.5 percent doubled, or 5 percent applied. Category 11B covered connectors using the '182 patent, so that a rate of 2 percent was applicable.

### 2. Analysis of ITT/Allied and ITT/Hughes royalty rates

The court is confronted with two "established" licensing agreements, representing divergent royalty rates. It must determine if either is probative of an established royalty rate. However, in contrast to defendant, plaintiff did not present its proof by way of expert analysis. Plaintiff's Mr. Peterson testified in support of the 1987 ITT/Hughes agreement, and counsel urged that these royalty rates be viewed only as a minimum. Mr. Enlow's endorsement of the ITT/Allied rates derived from an analysis of Hughes' and plaintiff's licensing activities for comparable patents from 1983 through 1987.

Defendant argues that the ITT/Allied agreement should be adopted as representing the true value of the '182 and '797 patents at the time of the taking. Since no license agreements had been entered into at the time of the taking in 1978, the court, defendant argues, should look to plaintiff's first exploitation of the patents which oc-

---

**10.** If Mr. Makuch's conclusions with regard to the classification of categories as connectors or components were in error, he erred in favor of plaintiff. The court would view several categories as connectors, not components bearing higher royalty rates, under Mr. Borsuk's defini-

tion. For example, Category 1B pigtails were described by Mr. Borsuk to be a connector cable assembly. Under his definition the sub-parts would include a connector. Since they were not sold disassembled, the court could view this category as containing connectors.

curred in 1985. Defendant views the ITT/Allied agreement as representing an established royalty. Alternatively, defendant argues that the ITT/Allied agreement is highly probative of the fair market value of the patents and in line with license rates proposed by plaintiff and entered into by Hughes for comparable patents.

Plaintiff, on the other hand, claims that the ITT/Hughes licensing agreement royalty rates are only a starting point. Plaintiff believes it is entitled to some increased factor above the Hughes rate, citing *Panduit Corp. v. Stahlin Brothers Fibre Work, Inc.*, 575 F.2d 1152, 1158 (6th Cir. 1978). *Panduit* is inapplicable since its adjustment considerations have no bearing on a section 1498 action. Plaintiff believes that the ITT/Allied agreement and earlier licensing proposals should not control, given that they were made at a time when the validity of the patents was not established. Plaintiff relies on *Studiengesellschaft Kohle, m.b.H. v. Dart Industries*, 862 F.2d 1564, 1572 (Fed.Cir.1988) ("*Kohle*"). *Kohle* does not stand for this proposition; rather, it supports the proposition that a court should look to as many facts as possible in reaching a proper royalty rate. *Id.* at 1573. Although a licensing agreement reached after a finding of validity may be "highly probative of a reasonable royalty," the trial court took the position that other circumstances may discount its probative value. *Studiengesellschaft Kohle, m.b.H. v. Dart Indus.*, 666 F.Supp. 674, 682 (D.Del.1987) (*citing Devex Corp. v. G.M. Corp.*, 494 F.Supp. 1369 (D.Del.1980), *aff'd*, 667 F.2d 347 (3d Cir.1981), *aff'd*, 461 U.S. 648, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983)), *aff'd*, 862 F.2d 1564, 1572 (Fed.Cir.1988). The Federal Circuit in *Kohle* approved the trial court's approach, but based its affirmance on its own review of the circumstances surrounding the parties' settlement, finding it highly probative, even though the infringer faced a permanent injunction, which would close down its operation, and an accounting trial. *Kohle*, 862 F.2d at 1572.

*Kohle* is distinguishable from the case at bar in that at the time of the ITT/Hughes agreement, plaintiff and Hughes already had settled the question of Hughes' commercial sales by an agreement dated January 1, 1987. Hughes was not facing the prospect of an accounting trial. No injunction could be sought against Hughes for continuing commercial sales, unless Hughes were to violate the settlement agreement in the future. In addition, Hughes could not be enjoined from continued government sales. *Decca*, 225 Ct.Cl. at 335, 640 F.2d at 1166.

The ITT/Hughes agreement cannot be ignored, but its probative value will be determined based upon the circumstances in which it was entered, and a determination of whether it is an indicator of an established royalty rate. As Chief Judge Markey has cautioned, "cases should not be cited for mere words." *Kohle*, 862 F.2d at 1572 (citation omitted). The language of a case must be supported by the backdrop of its facts.

Mr. Enlow, defendant's licensing expert, gave substantial testimony pertaining to the royalty rates that should be applied. Contrary to plaintiff's assertion that "the underpinning of Mr. Enlow's opinion was wrong as a matter of law," Plf's Br. filed Feb. 10, 1989, at 17, because the witness failed to appreciate that the ITT/Allied agreement allegedly was entered into under threat of litigation, the case law would not disregard completely the ITT/Allied agreement on this ground. Moreover, Mr. Enlow did not ignore the ITT/Hughes agreement, as plaintiff contends, in his analysis:

Q Now looking at the license agreement between ITT and Hughes, did you consider this agreement in your evaluation of the reasonable royalty payable by the government for its use of the 182 and 797 patents?

A Well, I did consider the agreement, but I discarded it from my consideration for the reason that it is so late in time compared to 1978. And further—

THE COURT: Compared to 1978? Yes, okay. Go ahead.

THE WITNESS: 1978 being the time of the initial taking. And I further re-

jected it as—for the reason that it obviously was done under threats from Mr. Cronin or Mr. Peterson, I'm not sure which one threatened them, but they did threaten them with alleged infringement, threatened them with treble damages, willful infringement, and attorney's fees. And also, if they didn't take the license that they would shut down Hughes' commercial business.

So based on the fact that it was an agreement under duress I did not feel it fitted into the usual considerations that negotiations used to point to a reasonable royalty.

Although Mr. Enlow may have been mistaken about the threat of treble damages and the shutting down of Hughes' commercial business as motivating factors, he did not ignore the ITT/Hughes agreement. Mr. Enlow did cite a letter from plaintiff to Hughes stating that Hughes would be subject to treble damages. In addition, Mr. Szabo's deposition testimony on this subject indicates that he felt pressured to enter into the licensing agreement with plaintiff, if for no other reason than that Hughes desired to resume its commercial sales and could not do so without a license.

The court agrees with plaintiff that Mr. Enlow gave insufficient consideration to the ITT/Hughes agreement, since he placed so much emphasis on the threat of litigation over what were minor commercial sales that plaintiff had forgiven and did not pursue. The inquiry shifts to whether there is independent evidence that favors or detracts from the applicability of the royalty rates in the ITT/Hughes agreement. The fact that the ITT/Hughes agreement was reached after this court held the patents valid is probative, as in *Kohle*, but *Kohle* does not require adoption of royalty rates in an agreement entered into incident to a determination of validity. Rather, *Kohle* requires analysis of all factors that may bear on the reasonableness of a royalty.

Several factors bode against adoption of the ITT/Hughes royalty rates: First, Mr. Szabo's impression, even if unfounded, that Hughes was under threat of suit and would lose its commercial business if it did not enter into an agreement with plaintiff; second, Mr. Szabo's belief that plaintiff represented that the ITT/Allied agreement contained a "most favored nations" clause requiring that Hughes not be given a more favorable rate, although Mr. Szabo said that plaintiff showed some flexibility in going below what he understood to be the ITT/Allied rates; third, Mr. Szabo's belief that Hughes was receiving rates comparable to the ITT/Allied rates; and fourth, the remote time frame in which the ITT/Hughes negotiations took place in relationship to the taking. In addition, if the Hughes royalty rates for Hughes' commercial sales are to be adopted, a 20 percent reduction for government end use would be applied. Plaintiff's 1984 proposal to Hughes, which covered both commercial and sales for government end use, included this reduction for government end use sales. The ITT/Hughes agreement was solely for commercial sales.

It should be pointed out that Mr. Szabo testified by deposition and that this testimony was impressionistic, although he repeatedly made the same points. Mr. Peterson was Mr. Szabo's counterpart in the negotiations, and he was certain that Mr. Szabo was certain that the threat of litigation was illusory and that no most-favored-nations clause was on the table. However, the Szabo deposition is in evidence and cannot be ignored. Plaintiff could have called Mr. Szabo and clarified these matters at trial.

The ITT/Allied agreement also has drawbacks. It was negotiated at a time when the validity of plaintiff's patents was in question. Allied was cognizant of this lawsuit. Allied recognized that if this court found plaintiff's patents valid, it was faced with the possibility of paying a higher royalty, set by the court, to continue using the patents. A May 10, 1985 memorandum from Roger H. Criss, who conducted the negotiations for Allied, supports this view:

> The primary benefit to the Bendix Connector Operation would be to obtain a license under the 38999 Series III fiber optic connector patents at a running royalty rate which is relatively small and at

a small downpayment. The alternative would be to await the outcome of the pending litigation brought by ITT against the U.S. and Hughes; if the ITT patents were held valid, most likely the court would set a much higher royalty rate as the measure of damages. If the ITT patents are held invalid, then we would not have to pay any royalties.

One of the factors favoring adoption of the royalty rates in the ITT/Allied agreement was that they were proposed by plaintiff at a time when Allied was aware of a potential liability for infringement. Mr. Criss' memorandum continues:

> The license under the alignment mechanism patent relates to the 4 pin approach used in the 906 series connector. The royalty rate of 1% is considered very reasonable, and our past exposure could have been as high as $50K. As now proposed, we would not have to account for any sales prior to July 1, 1985....

However, plaintiff had not threatened Allied with litigation at the time the ITT/Allied agreement was consummated.

The court also found helpful Mr. Enlow's application of the 15 *Georgia–Pacific* factors to the ITT/Allied agreement. *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), *modified and aff'd*, 446 F.2d 295 (2d Cir.), *cert. denied*, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971).[11] Mr. Enlow explained each factor that he considered applicable. In response to his review of the first factor, "[t]he royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty," Mr. Enlow stated that he considered the ITT/Allied agreement the closest to an established royalty because the agreement was entered into freely; it was finalized prior to trial of this lawsuit; it was the culmination of an agreement initiated by Allied's predecessor; and it gave Allied the right to enter into sublicenses. Allied exercised this right by sublicensing to eight or nine companies.

The second *Georgia–Pacific* factor applies to rates paid for comparable patents: "[t]he rates paid by the licensee for the use of other patents comparable to the patent in suit." 318 F.Supp. at 1120. Mr. Enlow testified that he looked at the August 1983 rates of the Hughes/Elco and Hughes/Bendix agreements because the agreements involved comparable patents entered into at a time proximate to the taking. He viewed these Hughes agreements as useful to determining the value to be placed on the infringed patents. The court views the agreements as indicative of the value Hughes placed upon the infringed patents, since Hughes was licensing the same patents, in the same time frame, and at similar rates as plaintiff proposed and obtained in the ITT/Allied agreement.

The third *Georgia–Pacific* factor applies to the exclusiveness of the license. Little time was spent on this factor as the ITT/Allied agreement, and the proposals were non-exclusive. The fourth *Georgia–Pacific* factor involves the patent holder's marketing practices. Does the patent holder expect "to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly?" 318 F.Supp. at 1120. Mr. Enlow testified that plaintiff willingly licensed its patents. This would have a tendency to lower royalty rates.

The fifth *Georgia–Pacific* factor applies to the commercial relationship between licensor and licensee. Mr. Enlow testified that since the Government was not a competitor of plaintiff the royalty rate would be lower. According to Mr. Enlow, this principle was reflected in several of plaintiff's proposals, which called for a 20 percent reduction for government end use.

The sixth *Georgia–Pacific* factor is "[t]he effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the in-

---

11. Plaintiff had the opportunity to have its expert apply the factors to the ITT/Hughes agreement, but chose not to. It does not detract from Mr. Enlow's analysis that he did not conduct this exercise given his reasons for discarding the 1987 ITT/Hughes agreement. Plaintiff's attempts to have Mr. Enlow perform this analysis on cross-examination was unwarranted.

vention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales." 318 F.Supp. at 1120. Mr. Enlow believed the first part of this factor was inapplicable since the Government was not in the fiber optics business. Mr. Enlow stated that connectors are commodity items and a licensor would not normally expect convoyed sales.

Mr. Enlow further characterized that the seventh *Georgia–Pacific* factor—duration of the patent—was neutral. The eighth *Georgia–Pacific* factor reads: "The established profitability of the product made under the patent; its commercial success; and its current popularity." 318 F.Supp. at 1120. Mr. Enlow noted that at the time of the taking the product had demonstrated very little profitability. Plaintiff was not yet commercially producing fiber optics products. Currently the market looks to the availability of commercial alternatives. This assertion was supported by the testimony of Mr. Davis. The court also notes the decrease in Hughes' sales for 1987 and 1988.

The ninth *Georgia–Pacific* factor is directed to the utility of the patented property. Mr. Enlow opined that connectors had limited utility. They were a commodity item, purchasers had a choice of alternatives, and plaintiff's product was not pioneering. In his opinion these factors would have a tendency to push the royalty rate down.

The tenth *Georgia–Pacific* factor applies to the commercial use of the patent as "produced by the licensor" and "the benefits to those that have used the invention." 318 F.Supp. at 1120. Mr. Enlow stated that there was little early commercial use of the patent. The patented item itself was not the driving factor behind the purchase of the non-patented connectors. The infringed patents had no special value to the customers. Mr. Enlow found the eleventh factor difficult to assess, but not particularly significant.

The twelfth *Georgia–Pacific* factor addresses the portions of the profit or selling price which is customarily exacted for use of the invention or analogous inventions. Mr. Enlow testified that the royalty rate is usually keyed to the selling price of the items, as was reflected in the agreements and proposals, and not a percentage of profit. He stated that all of the agreements he reviewed for his testimony related to the selling prices of the connectors. He believed that the ITT/Allied agreement because of its proximity in time to the commercialization of the patents and an established payment history was the best indicator of an established royalty.

The thirteenth *Georgia–Pacific* factor is "the portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer." 318 F.Supp. at 1120. Mr. Enlow testified that the portion of the realizable profit for the patented items would be small, since the patents are only small parts of the connector device. The court agrees with Mr. Enlow's assertion. The value of the connector with the patented items installed is the best indicator of the marketing value of the patents. *See Bendix Corp. v. United States*, 230 Ct.Cl. 247, 255–56, 676 F.2d 606, 611 (1982).

The fourteenth *Georgia–Pacific* factor considers expert opinions; there is only Mr. Enlow's on point. The fifteenth *Georgia–Pacific* factor involves the hypothetical negotiation where there is not an established royalty:

The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

318 F.Supp. at 1120. The fifteenth *Georgia–Pacific* factor subsumes the inquiry of the other factors. Mr. Enlow believed this factor unnecessary stating there were several actual indicators of an established royalty, *e.g.*, the agreements and proposals. He viewed the ITT/Allied agreement as representing a bargain between a willing licensor and willing licensee.

### 3. *Reasonable royalty*

The ITT/Allied license is a good indicator of the value of plaintiff's patents. It reflects plaintiff's view of the infringed patents' worth as of the moment of the agreement. Plaintiff's Mr. Cronin, who negotiated the ITT/Allied agreement, testified on deposition that "the rates were somewhat higher than normal...." because Allied had unlimited rights to sublicense. Moreover, according to Mr. Cronin, doubling of royalties was "uncommon" in the industry. The proposals reflect the negotiating parameters indicating how others viewed the value of the same patents. Two proposals were made by plaintiff in 1984 attempting to secure license agreements. Plaintiff's first proposal was to Hughes. Plaintiff's proposal valued the two patents at 2.4 percent. Plaintiff's second proposal to Bendix was slightly higher. It involved the same patents and called for a rate of 2.8 percent. The Bendix proposal was the basis for the ITT/Allied agreement. The ITT/Allied agreement valued the '182 patent at 2.5 percent and the '797 patent at 3 percent. A rate of 3 percent was established for the use of the patents in combination.

However, the court is not fully persuaded by Mr. Enlow's opinion. Several factors militate against the adoption of the ITT/Allied license rates. First, plaintiff, in its license proposals and in the ITT/Allied agreement, had an expectation of including additional patents. Other patents were identified that were not the subject of this suit, as well as the '145 patent which this court found not to be infringed. Although the marginal value of the patents combined may increase, the individual value of patents is reduced where they are sold in combination with others.

More importantly, plaintiff is viewed, in the hypothetical negotiation, as having a valid patent. *Kohle*, 666 F.Supp. at 680. However, "a finding of validity [by a court] is not entitled to any collateral effect, as would be the case if the patent were found invalid...." *Dynamics*, 5 Cl.Ct. at 608 (citation omitted). Since it is clear that Allied viewed plaintiff's patents as weak, but the license agreement would otherwise qualify as one entered into by a "willing licensee," under the standards discussed, the court should return plaintiff to the position of approaching the bargaining with valid patents. Nonetheless, a patent holder is not normally in a position of having a judicial determination of validity. Therefore, the court should neither base the royalty rates on a conclusion of validity, nor ignore the effect of the legal ruling, but should adjust the royalty to take into account the validity of the patents. *See Sun Studs, Inc. v. ATA Equip. Leasing, Inc.*, 872 F.2d 978, 994 (Fed.Cir. Mar. 31, 1989) (citing *Bio–Rad Laboratories, Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 607 (Fed.Cir.), *cert. denied*, 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984); *Panduit*, 575 F.2d at 1158)).

Such an adjustment restores hypothetically the status quo as of the time of the taking. Each party begins with a clean slate in the license negotiation. The licensee is desirous of exploiting plaintiff's patents. The licensor seeks a willing licensee attempting to gain a reasonable royalty rate for granting this right. The licensor must accommodate the licensee in order to fulfill the licensor's expectations, since the court operates on the assumption that the licensor wishes to license its patents. *Tektronix*, 213 Ct.Cl. at 268, 552 F.2d at 349 (willingness of the parties to engage in negotiations is irrelevant). In the hypothetical negotiation, the licensor is not without pressure. Because it always faces the possibility that its patents could be held invalid, it must be opportunistic. *Id; see also Dynamics*, 5 Cl.Ct. at 608.

The court utilized the ITT/Allied agreement and ITT/Hughes agreement, the ITT proposals, and the Hughes/Elco and Hughes/Bendix agreements. The court

also considered the testimonies of Messrs. Peterson and Enlow, and finds, in its discretion, that the royalty rates should be based on the ITT/Allied agreement. The ITT/Allied definitions will be used since they differ only minimally from ITT/Hughes' definitions. The ITT/Allied definitions benefit plaintiff by placing contacts in the component category, thereby providing plaintiff a higher rate than it would be entitled to under the ITT/Hughes definitions.

Due to the weakness of the patents at the time the ITT/Allied agreement was negotiated and the factors discussed above supporting the ITT/Allied rates, the court will make a 1 percent upward adjustment, establishing a reasonable royalty rate of 3.5 percent for the '182 patent, 3 percent for the '797 patent, and 4 percent for the two patents when used together. The rates will be doubled when the devices in the includable categories are sold as components.

Overall, the court has confidence in Mr. Enlow's opinion about how the royalty rates should be applied. His methodology was fundamentally sound. The court performed its own analysis to determine the rates to be applied to individual categories. Mr. Enlow erred with regard to Categories 2A and 2B, but otherwise the court finds his applications to be correct. Category 2A identifies socket contacts, which are not infringed, but which mate with the '182 patent. Under this court's analysis of the entire market value rule, the category would bear the rate of contacts sold individually. This rate is doubled under the ITT/Allied definition. The rate to be applied is 7.0 percent. Category 2B identifies jumper cables, which Mr. Makuch classified as components. Mr. Enlow erroneously determined that the '797 patent was involved. Therefore, Category 2B also bears a 7 percent rate. Since defendant did not include in the compensation base Category 7A which is connector halves and Category 7B which is connector cable assemblies, the

court must determine the applicable royalty rates. Category 7A identifies connector halves, which defendant agrees are components. Category 7B identifies cable assemblies, which are connectors. Therefore, the middle value between 3 percent and 4 percent is adopted, and a rate of 3.5 percent will be applied. The 3.5 percent rate is doubled for Category 7A. For the remaining categories, 1 percent will be added to the royalty rates identified by Mr. Enlow. The rates are doubled consistent with the ITT/Allied agreement. The royalty rates to be applied to the compensation base follow:

| Category | Licensed Product | Type | Court Royalty Rate % |
|---|---|---|---|
| 1A | Yes | Contact | 7% |
| 1B | Yes | Component | 7% |
| 2A | Yes | Contact | 7% |
| 2B | Yes | Component | 7% |
| 3 | Yes | Component | 7% |
| 4 | Yes | Component | 6% |
| 5 | Yes | Component | 8% |
| 6A | Yes | Connector | 3.25% |
| 6B | Yes | Connector | 4% |
| 7A | No | Component | 7% |
| 7B | No | Connector | 3.5% |
| 11A | Yes | Component | 7% |
| 11B | Yes | Connector | 3.5% |

Appendix II applies the royalty rates to the compensation base.

III. Delay compensation

■ Compensation is "reasonable and entire" if it includes recompense for reasonable royalties and an amount in prejudgement interest for the delay of royalty payments. Recovery of reasonable compensation under 28 U.S.C. § 1498 is premised on a theory of a taking under the fifth amendment. *Tektronix, Inc. v. United States*, 213 Ct.Cl. 257, 264, 552 F.2d 343, 346 (1977), *cert. denied*, 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978); *Calhoun v. United States*, 197 Ct.Cl. 41, 51, 453 F.2d 1385, 1391 (1972). The statute provides that if use by the United States is found, as it was here, the patentee shall recover "reasonable and entire compensation." [12]

---

12. In *Waite v. United States*, 282 U.S. 508, 51 S.Ct. 227, 75 L.Ed. 494 (1931), the Court drew the parallel between the requirement for "entire" compensation and "just compensation" un-

der the fifth amendment. *Id.* at 509, 51 S.Ct. at 227 (citing *Seaboard Air Line Ry. v. United States*, 261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664 (1923) (court awarded prejudgment interest as

In construing the term "entire," the Supreme Court has said that the intent is "to accomplish complete justice as between the plaintiff and the United States." *Waite v. United States*, 282 U.S. 508, 509, 51 S.Ct. 227, 227, 75 L.Ed. 494 (1931). The Court has also ruled that where payment and fair market value of the thing taken is deferred, as will typically be the case in the event of a judicially declared taking, something more is constitutionally required to compensate the owner for the delay in payment. This additional element is measurable in terms of "reasonable interest" or its equivalent. *Albrecht v. United States*, 329 U.S. 599, 602, 67 S.Ct. 606, 608, 91 L.Ed. 532 (1947); *Waite*, 282 U.S. at 509, 51 S.Ct. at 227; *Seaboard Air Line Ry. v. United States*, 261 U.S. 299, 306, 43 S.Ct. 354, 356, 67 L.Ed. 664 (1923).

■ The determination of the proper rate of interest or delay compensation is one of fact, *Miller v. United States*, 223 Ct.Cl. 352, 399, 620 F.2d 812, 837 (1980), and is exclusively a judicial function under the Constitution. *See Dynamics Corp. of America v. United States*, 766 F.2d 518, 520 (Fed.Cir.1985). It follows that limitations on award of interest to what Congress allows or disallows are not applicable. *See Seaboard*, 261 U.S. at 306, 43 S.Ct. at 356; *Miller*, 223 Ct.Cl. at 400, 620 F.2d at 837.

The method of calculating prejudgment interest in this case was disputed, although the rates themselves were not. Plaintiff's position is that given the realities of the marketplace and commercial practice, compensation could neither be reasonable nor

entire if the prejudgment interest for delay were not compounded. Defendant counters on brief that both court precedent and substantial policies support the use of simple interest.

*Dynamics*, 5 Cl.Ct. 591 (1984), was an accounting action against the United States. The Federal Circuit reversed the trial court's award of delay compensation based on simple interest and remanded for the Claims Court to consider: 1) whether, taking into account the remand opinion and 28 U.S.C. § 1961 (1982), reasonable and entire compensation may include compounded interest in calculating prejudgment interest for purposes of delay damages; and, if so, 2) whether it should be allowed under the facts and circumstances of the case. 766 F.2d at 520. *Dynamics* was settled on remand after briefing, but before decision. Consequently, the case at bar is one of first impression as it confronts the issues framed in *Dynamics*. Because of its importance to the issues, the appellate court's analysis in *Dynamics* is set out in full:

> As to DCA's argument that compound interest rather than simple interest should be used in calculating delay compensation, the Claims Court noted that this court recently affirmed a district court's judgment which included compounded prejudgment interest in a patent infringement case under 35 U.S.C. § 284, *Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1510 n. 1, 220 USPQ 929, 934 n. 1 (Fed.Cir.), *cert. denied* [469] U.S. [871], 105 S.Ct. 220, 83 L.Ed.2d 150 (1984). Nevertheless, the Claims Court

part of "full equivalent" of value taken by Government)).

After *Waite* the Court of Claims acknowledged the strong relationship between the grant of reasonable and entire compensation under section 1498 and the award of just compensation under the fifth amendment. *Calhoun*, 197 Ct.Cl. at 59, 453 F.2d at 1395–96 (eminent domain principles are "infused" into section 1498, although, in the absence of evidence upon which to base an increased rate, court equated simple interest with the requirements of "just compensation" under the fifth amendment); *Dynamics Corp. of America v. United States*, 5 Cl.Ct. 591, 608 (1984) (unlike patent proceeding in district court, section 1498 claims based on eminent

domain and not tort principles), *aff'd in part, rev'd in part, and remanded on other grounds*, 766 F.2d 518 (Fed.Cir.1985). The parallel is useful because by linking reasonable and entire compensation with practice under the fifth amendment, successful plaintiffs are entitled to the full market value of their losses.

The common element between "reasonable and entire compensation" and "just compensation" under the fifth amendment is a requirement for basic fairness between the Government and its citizens, *Dynamics Corp.*, 5 Cl.Ct. at 609, to the end that the patent holder receives neither too little nor excessive compensation. *Id.; see also Tektronix, Inc.*, 213 Ct.Cl. at 272, 552 F.2d at 354.

concluded that the statutory standard of "reasonable and entire compensation" in 28 U.S.C. § 1498 is the equivalent of the Fifth Amendment's "just compensation" in which interest is not awarded as such, but, rather, is considered to be a part of the "compensation,"[4] and that "[t]raditionally, it has always been limited to simple interest," citing *Bendix Corp. v. United States*, supra, where simple prime rate interest was approved, and *Calhoun v. United States*, 197 Ct.Cl. 41, 453 F.2d 1385, 172 USPQ 438 (Ct.Cl. 1972), where the court stated that "simple interest (as part of just compensation) is to accrue."

We are persuaded that, based on the facts and circumstances in a particular case,[5] compound interest may more nearly fit with the policy "to accomplish complete justice as between the plaintiff and the United States" under the just compensation clause of the Fifth Amendment. *Waite v. United States*, 282 U.S. 508, 51 S.Ct. 227, 75 L.Ed. 494 (1931). Moreover, we do not consider that what may have been "traditional," without a clear holding by one of our predecessor courts that delay damages cannot include compound interest, is binding precedent on this court under *South Corp[.] v. United States*, 690 F.2d 1368, 215 USPQ 657 (Fed.Cir.1982). However, 28 U.S.C. § 1961(c)(3) appears to require the Claims Court to allow compounded interest on judgments, but is silent on prejudgment interest. We note that no reference is made in the Claims Court's opinion to 28 U.S.C. § 1961 and its effect on delay damages from and after judgment herein.

---

[4] *See Leesona Corp. v. United States*, 220 Ct.Cl. 234, 599 F.2d 958 (Ct.Cl.), *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979).

[5] DCA's expert witness, Dr. Enrique Arzac, Professor of Finance and Economics and head of the Finance Department at Columbia Union College School of Business, testified without rebuttal that the appropriate method for calculating delay damages to make DCA whole would be by using compound interest and showed the inequity of using simple interest.

[6] We note that the legislative history of the Federal Courts Improvement Act of 1982, in commenting on the necessity for awarding pre-judgment interest to compensate a plaintiff, uses an example showing application of compounded interest. S.Rep. No. 275, 97th Cong., 2d Sess. 30 (1981), *reprinted in* 1982 U.S.Code Cong. & Ad. News 11, 40. [Note 6 accompanied the instructions on remand.]

766 F.2d at 519–20.

At the outset the court must assess the effect of the appellate decision, a task complicated by the fact that *Dynamics* involved another accounting trial. In *Dynamics* the appellate court saw some indicia that compounding was either always appropriate or appropriate in the right circumstances. It made clear that past use of simple interest was not controlling. As to the effect of the testimony of plaintiff's expert, the court characterized his testimony that compound interest was the appropriate method for calculating delay damages for plaintiff as unrebutted. Subsequently, in referring to the remand of *Dynamics* in *Branning v. United States*, 784 F.2d 361, 364 (Fed.Cir.1986), the Federal Circuit described this testimony as "undisputed evidence showing that under the facts and circumstances involved, the case of simple interest would be 'inequitable.'" Since *Dynamics* was remanded for fact finding on the propriety of compounding interest in that case, the Federal Circuit's characterization of the expert's testimony in *Dynamics* and in *Branning* did not resolve the issue. As defendant argues in this case, the remand in *Dynamics*, coupled with the discussion of *Dynamics* in *Branning*, establishes only that the facts and circumstances of a given case must justify an award of compound interest, assuming that it is held that compound interest lawfully can be awarded as the measure of delay compensation.

1. *Whether reasonable and entire compensation may include compounded interest in calculating delay compensation*

Defendant has cited cases from the "*Pitcairn* trilogy," *Pitcairn v. United States*, 212 Ct.Cl. 168, 547 F.2d 1106 (1976), *cert. denied*, 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978), and its subsequent adoption in *Tektronix*, 213 Ct.Cl. at 274–75,

552 F.2d at 353, and *Miller*, 223 Ct.Cl. 352, 620 F.2d 812, as precedent for the use of simple interest. In *Pitcairn* the Court of Claims established the interest rates for awards of delay compensation for the years 1946–1975. The rates were based upon *Moody's Composite Index of Fields on Long Term Corporate Bonds* (*"Moody's Index"*). As to the development of the simple interest measure from *Moody's Index*, the court remarked only that the trial judge had sufficient evidence before him to make "an informed and reasoned determination as to the appropriate measure of just compensation...." *Pitcairn*, 212 Ct.Cl. at 197, 547 F.2d at 1124.

The simple interest rates applied in *Pitcairn* were adopted in *Tektronix* for all eminent domain actions in the Court of Claims and were so employed in *Miller*. In fact, the trial judge in *Tektronix* stated that the *"Pitcairn* method" was appropriate for both pending and future just compensation cases and that the compounding of delay interest was "contrary to settled precedent." *Tektronix, Inc. v. United States*, 188 U.S.P.Q. 25, 32–33 (Ct.Cl.Tr. Div.), *modified*, 213 Ct.Cl. 257, 552 F.2d 343 (1977).

Defendant further concludes from the *"Pitcairn* trilogy" that the use of simple interest for other litigants implies that this measure would fairly compensate plaintiff and that plaintiff is not deserving of the special advantage of compound interest. As defendant argues:

> Neither party has introduced evidence showing that the use of the *Miller* rates or the statutory rates in this case would be unfair to either Plaintiff or Defendant. The application of these rates in this case will continue the judicial policy of avoiding discrimination between eminent domain condemnees.

Def's Br. filed Jan. 12, 1989, at 9.

Based on *Pitcairn's* focus on rate selection, the reference to *"Pitcairn* method" logically refers to the method of choosing interest rates and not to the method for applying those rates. *Miller* also addresses the issue of interest rates, not the issue of compound interest. Consequently, the court concludes that the *"Pitcairn* trilogy" does not require delay compensation to be measured by simple interest. However, *Miller* did recognize the "strong judicial policy in favor of the establishment of a uniform rate of interest applicable to condemnation cases in order to avoid discrimination among litigants." 223 Ct.Cl. at 402, 620 F.2d at 838 (citations omitted). The *Miller* court nonetheless set a higher rate of interest than reflected in other judgments and executive actions reasoning that "plaintiffs cannot be penalized because most other redwood park condemnees did not pursue the interest issue." 223 Ct.Cl. at 402 n. 24, 620 F.2d at 839 n. 24. Moreover, the Court of Claims previously stated that "[t]he method of determining delay compensation should be justified by the evidence, and the rate should be responsive to the ends of justice. The ultimate test, of course, is that the plaintiff must receive just compensation." *Pitcairn*, 212 Ct.Cl. at 190–91, 547 F.2d at 1121.

Even premised on a simple interest methodology, the rates for delay compensation due under the fifth amendment have been measured in several ways. For instance, in inverse condemnation suits, the Claims Court has in recent years measured delay compensation by the simple interest rates established by the Secretary of the Treasury pursuant to the Contracts Disputes Act. *See, e.g., Henry v. United States*, 8 Cl.Ct. 389, 393 (1985); *Foster v. United States*, 3 Cl.Ct. 738, 744 (1983), *aff'd mem.*, 746 F.2d 1491 (Fed.Cir.1984), *cert. denied*, 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 478 (1985); *Jones v. United States*, 3 Cl.Ct. 4, 7 (1983). Prior to November 1986, the Declaration of Takings Act provided that interest on deficiency judgments would be 6 percent simple interest from the date of the taking to the date of payment. However, subsequent to the decision in *United States v. Blankinship*, 543 F.2d 1272, 1276 (9th Cir.1976), holding that the 6 percent rate was only a floor on the allowable interest rate, courts in land condemnation cases have selected different rates in these cases. *See United States v. 429.59 Acres of Land*, 612 F.2d 459, 465 (9th Cir.1980); *United States v. 97.19 Acres More or Less,*

511 F.Supp. 565, 569 (D.Md.1981); *United States v. 319.46 Acres of Land More or Less*, 508 F.Supp. 288, 290 (W.D.Ok.1981). In redwood forest condemnation cases, also under a statutory 6 percent rate of interest on deficiency judgments, the Court of Claims found that the statutory rate set a floor, not a ceiling. *Miller*, 223 Ct.Cl. at 400, 620 F.2d at 837.

This court is of the opinion that the goal of establishing a uniform policy regarding delay compensation in eminent domain cases, although desirable, must give way to the established law that there is no fixed formula for establishing compensation for fifth amendment takings. *See Georgia–Pacific Corp. v. United States*, 226 Ct.Cl. 95, 106, 640 F.2d 328, 336 (1980). Courts have stepped outside the uniform policy when the requirements of justice so dictated. Moreover, as stated in *Miller*, plaintiff in the case at bar cannot be penalized by the failure of previous litigants to pursue the compound interest issue. The use of simple interest in previous eminent domain cases does not prevent the use of compound interest in measuring delay compensation under the fifth amendment.

Two lines of delay compensation cases are relevant to the court's inquiry: eminent domain cases and patent infringement cases between a patent holder and the Government under 28 U.S.C. § 1498. Patent infringement cases between private parties have also been considered. Each set of cases has its own development and, not surprisingly, its own approach to the delay damages question.

Paralleling the parties' divergent views, there is authority in the eminent domain area for the award of either simple or compound interest. The only distinction between the cases that can be drawn is the depth of analysis devoted to the award of interest as delay compensation.[13]

In *97.19 Acres More or Less*, 511 F.Supp. at 569–70, the court relies on the "*Pitcairn* trilogy" when it states:

> I am of the opinion that the Court of Claims formula adequately compensates a property owner for the deprivation of the deficiency amount, and there is no need to compound the interest calculated under that formula....

There is little discussion of how the court is persuaded that simple interest adequately compensates the deprived landowner. There is no examination of the facts and circumstances of the case to support or direct the court to the conclusion; rather, the court points to the "Court of Claims formula." Simple interest, the court explains, is the method chosen by the Court of Claims, the "acknowledged" expert in the area. *Id.* It is clear that the *97.19 Acres* court and others, *see, e.g., Washington Metropolitan Area Transit Authority v. One Parcel of Land*, 706 F.2d 1312, 1322 (4th Cir.), *cert. denied*, 464 U.S. 893, 104 S.Ct. 238, 78 L.Ed.2d 229 (1983), rely on this court's best judgment as to the method of awarding delay compensation. Under these circumstances a mechanical application of rules, because they are time-honored or "traditional," simply will not do.[14]

The eminent domain cases from this court cited by defendant are useful in that they apply as an accepted practice awards of simple interest. *See, e.g., Henry*, 8 Cl.Ct. at 393; *Foster*, 3 Cl.Ct. at 744; *Jones*, 3 Cl.Ct. at 7. Perhaps because the rule has been consistently applied, its continued use scarcely warrants more than a brief mention in any of these opinions.

---

**13.** The earliest cases in support of the proposition that the award of compound interest on a deficiency judgment is improper are *United States v. 20.08 Acres of Land*, 39 F.Supp. 421 (W.D.Pa.1941), and *United States v. 125.71 Acres of Land*, 54 F.Supp. 193 (W.D.Pa.1944). In *20.08 Acres* the court stated that recovery of interest on delay damages "would be the equivalent to the allowance of interest on interest. This is barred by law." 39 F.Supp. at 424. *125.71 Acres* does not add anything in terms of sub-

stantive analysis. The court devotes two lines to the subject of compound interest, stating simply that it cannot be applied in eminent domain cases. 54 F.Supp. at 194.

**14.** The court in *97.19 Acres* cast doubt on the continuing authority of *125.71 Acres*, and by implication *20.08 Acres*, stating that *125.71 Acres* did not discuss the compound interest issue "authoritatively." 511 F.Supp. at 570.

By contrast, there is well-reasoned authority on the use of compound interest.[15] In *319.46 Acres of Land More or Less*, 508 F.Supp. at 291, the court held that landowners were entitled to more than simple interest, stating:

The economic reality is simply that if the full value of just compensation had been deposited with the Court contemporaneously with the filing of the declaration of taking, the landowner would have been able to earn compound interest. Thus, prohibiting the landowner from recovering compound interest on the deficiency acts to retroactively reduce the value of just compensation at the time of the taking by undervaluing its present worth. Accordingly, it is the conclusion of the Court that interest paid on the deficiency is to be compound interest instead of simple interest.

In upholding an award of compound interest, the Ninth Circuit endorsed a similar analysis in *429.59 Acres of Land*, 612 F.2d 459. In *429.59 Acres* the Ninth Circuit determined that compound interest reflected the return that a reasonably prudent person would have received had he been given the value of the taken property on the date of taking. *Id.* at 465. The compounding of interest was appropriate means to compensate the landowner from the lost interest that the deficiency would have produced during the interim. *Id.* The Ninth Circuit reasoned:

The payment of interest on deficiency awards in condemnation cases is designed to satisfy the constitutional standard of just compensation by putting the owner "in as good position pecuniarily as he would have occupied if his property had not been taken." (*United States v. Miller, supra*, 317 U.S. [369] at 373, 63 S.Ct. [276] at 279–280 [87 L.Ed. 336 (1943)].) It is assumed that a person who received the pecuniary value of his property as of the date of taking would invest these funds in a reasonably prudent manner. Thus, it is proper, when payment of just compensation is delayed, to fix interest on any deficiency award at the rate "a reasonably prudent person investing funds so as to produce a reasonable return while maintaining safety of principal" would receive....

*Id.* at 464–65.

As in the area of eminent domain, precedent exists in patent infringement actions brought under 35 U.S.C. § 284 to support the award of either simple or compound interest. *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 557 (Fed.Cir. 1984) (reasonable to award prejudgment simple interest); *Studiengesellschaft Kohle, m.b.H. v. Dart Indus. Inc.*, 862 F.2d 1564, 1580 (Fed.Cir.1988) (award of prejudgment interest compounded at the prime rate not beyond special master's discretion). The only rule that does emerge is that the method of apportioning interest, whether simple or compound, is committed to the informed discretion of the fact finder. *Paper Converting Mach. Co. v. Magna Graphics Corp.*, 745 F.2d 11, 24 (Fed. Cir.1984); *Railroad Dynamics, Inc. v. A.*

**15.** An early case supporting plaintiff's position is *United States v. Northern Pac. Ry.*, 51 F.Supp. 749 (E.D.Wash.1943). The court held that delay damages measured by 6 percent interest from the time of the taking to the time of judgment was an inseparable part of the just compensation awarded, so that an additional 6 percent interest on the award from the time of judgment to the time of payment into court did "no violence to the rule which proscribes interest on interest." 51 F.Supp. at 750.

In *United States v. Blankinship*, 431 F.Supp. 403 (D.Or.1977), the court followed *Northern Pacific* in holding that just compensation awarded in a case brought pursuant to the Declaration of Taking Act included simple interest on the deficiency judgment from the time of taking to the time of payment. When payment was delayed during the pendency of the Government's appeal, the court found plaintiff was entitled to an additional interest on the entire award from the time of judgment to the time of payment. The court held that the additional award was "not an impermissible grant of 'interest on interest,' but is simply an award of interest on the 'just compensation' improperly withheld from the landowners...." *Blankinship*, 431 F.Supp. at 404. In *319.46 Acres* the court cited *Northern Pacific* and *Blankinship* for the proposition that compound interest was not the same as an impermissible grant of "interest on interest," but was necessary to provide the full equivalent of the value of just compensation if it had been paid contemporaneously with the taking. 508 F.Supp. at 291.

*Stucki Co.*, 727 F.2d 1506, 1520 (Fed.Cir.), *cert. denied*, 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984).

Within the rule the Federal Circuit has emphasized the term "informed discretion." As demonstrated in *Bio–Rad Laboratories, Inc. v. Nicolet Instruments Corp.*, 807 F.2d 964, 969 (Fed.Cir.1986), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3187, 96 L.Ed.2d 675 (1987), the Federal Circuit was unwilling to impute a proper basis for choosing between simple and compound interest where the trial court failed to select one. In remanding to the district court for reconsideration of the amount of delay compensation, the court wrote:

> The district court gave no convincing reason why Bio–Rad's alleged delay ... warranted using a seven percent rate of uncompounded interest....
>
> . . . .
>
> ... Since determining the amount of prejudgment interest lies largely within the district court's discretion, in deciding whether the district court properly exercised that discretion, we restrict our review to the stated basis upon which the district court acted and do not consider other grounds upon which the district court might have based its decision.
>
> . . . .
>
> ... [T]he justification for an award of prejudgment interest "must have some relationship to the award of prejudgment interest."

*Id.* at 969 (quoting *Radio Steel & Mfg. Co. v. MTD Prod. Inc.*, 788 F.2d 1554, 1558 (Fed.Cir.1986)). Additionally, the Federal Circuit has resisted attempts by litigants to articulate a single, strict formula to be applied in delay compensation cases. *Nickson Indus., Inc. v. Rol Mfg. Co., Ltd.*, 847 F.2d 795, 801 n. 2 (Fed.Cir.1988) (court disagreed that plaintiff's "minimal damages" "compelled" the use of compound interest); *Dynamics*, 766 F.2d at 520 (court declines to consider simple interest as the "traditional" method in delay compensation cases); *Gyromat*, 735 F.2d at 557 (since Congress legislated to impose compound interest on judgments only, in the absence of direction from Congress, court unwilling

to require the compounding of prejudgment interest as a matter of law). The award of delay compensation must be tailored to the circumstances of each case.

The relevance of the practice for ascertaining delay compensation in Title 35 actions is marginal. Recovery under section 1498 is not a substitute for Title 35. *See Leesona Corp. v. United States*, 220 Ct.Cl. 234, 251, 599 F.2d 958, 968, *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). The waiver of sovereign immunity under section 1498 must be strictly construed. *See Decca, Ltd. v. United States*, 225 Ct.Cl. 326, 335, 640 F.2d 1156, 1167 (1980), *cert. denied*, 454 U.S. 819, 102 S.Ct. 99, 70 L.Ed.2d 89 (1981). As a general proposition, moreover, statutes consenting to the payment of compound interest against the United States must do so explicitly. *See United States v. Mescalero Apache Tribe*, 207 Ct.Cl. 369, 518 F.2d 1309, 1316 (1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). However, the controlling principle in eminent domain cases is that "complete justice" must be obtained between the litigant and the United States. *Waite*, 282 U.S. at 509, 51 S.Ct. at 227. Delay compensation is derived from this principle, so that the United States may be required under the fifth amendment to pay prejudgment interest in section 1498 actions, even in the absence of a statute authorizing such payment. If "complete justice" requires that prejudgment interest be compounded, *Waite* is authority that statutory authorization is not required.

The weight of authority from the Claims Court and its predecessor supports the use of simple interest in section 1498 cases. The court can find no case since *Pitcairn* where interest has been compounded in a calculation of delay compensation. Also significant, however, is that opinions in prior section 1498 cases have not focused on the method of calculating delay compensation, whether by simple or compound interest, but rather at what interest rate the successful plaintiff will receive compensation. *See, e.g., Bendix Corp. v. United States*, 230 Ct.Cl. 247, 265, 676 F.2d 606, 615–16 (Fed.Cir.1982) (plaintiff affirmative-

ly demonstrated entitlement to a rate greater than found under *Pitcairn* ); *Amerace Esna Corp. v. United States,* 199 Ct.Cl. 175, 462 F.2d 1377 (1972) (plaintiff failed to show an entitlement to an interest rate greater than the one established by court precedent). Further, in light of the Federal Circuit's remand in *Dynamics,* wherein the Claims Court was directed to consider whether reasonable and entire compensation included compounded delay interest, the court cannot rely on a "time-honored" practice which has neither been adequately examined or defended in terms of commercial practice. The method of fixing delay compensation must be examined for its ability to provide plaintiff with "reasonable and entire compensation." *Waite,* 282 U.S. at 509, 51 S.Ct. at 227.

The *Dynamics* court also instructed the Claims Court to take into account 28 U.S.C. § 1961 (1988), in determining whether compound interest may be applied in setting delay compensation. This statute provides, in pertinent part:

(a) Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes to it to all Federal judges.

(b) Interest shall be computed daily to the date of payment except as provided in section 2516(b) of this title and section 1304(b) of title 31, and shall be compounded annually.

(c)(1) This section shall not apply in any judgment of any court with respect

to any internal revenue tax case. Interest shall be allowed in such cases at the underpayment rate or overpayment rate (whichever is appropriate) established under section 6621 of the Internal Revenue Code of 1954 [26 U.S.C.A. § 6621].

. . . .

(3) Interest shall be allowed, computed, and paid on judgments of the United States Claims Court only as provided in paragraph (1) of this subsection or in any other provision of law.

By calling for the rates in 26 U.S.C. § 6621, the statute adopts the interest rate paid on tax refunds. Congress directed the Internal Revenue Service to compound interest daily under 26 U.S.C. § 6621 so as to conform with commercial practice. *See Report on Tax Equity and Fiscal Responsibility Act of 1982,* S.Rep. No. 494, 97th Cong., 2d Sess. 305, *reprinted in* 2 1982 U.S.Code Cong. & Admin.News 781, 1046–47. However, the court does not find a congruity between pre- and post-judgment interest, nor did the Federal Circuit in *Gyromat* when analyzing the legislative history of the amendment to 28 U.S.C. § 1961(b) to authorize compounding of post-judgment interest only. 735 F.2d at 557. Section 1961(b) demonstrates that Congress applied post-judgment interest to any judgment, without regard to whether it was mandated by the Constitution. The issue before this court is to determine what the Constitution requires. Although *Dynamics* cited legislative history to section 1961(b) suggesting that compounded interest may be appropriate if there are guidelines for awarding prejudgment interest applicable to federal courts, 766 F.2d at 520 (citing S.Rep. No. 275, 95th Cong., 2d Sess. 30 (1981), *reprinted in* 1982 U.S.Code Cong. & Admin.News 11, 40), *Gyromat* concluded, based on more authoritative legislative history than the Senate Report, that Congress specifically rejected inclusion of prejudgment interest in the legislation.

■ The case law supporting plaintiff's position better complies with the fifth amendment's requirement of just compensation for government takings in section 1498 actions. It is well established that the

just compensation clause requires that when an "award is delayed, the owner is entitled to interest thereon sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." *Kirby Forest Indus. v. United States*, 467 U.S. 1, 10, 104 S.Ct. 2187, 2194, 81 L.Ed.2d 1 (1984). If a patent holder was fully compensated at the time of the taking, he would have full use of the award money. Delay in payment entails more than delay in possession of the award. It also necessarily means delay in the use of the money. Full compensation, then, requires that a patent holder whose award has been delayed be compensated for his inability to utilize his money. A patent holder cannot reinvest the increased value of his property when he possesses neither his property nor its monetary worth. Simple interest cannot put the property owner "in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation," because it undervalues the worth of the patent. Consequently, the court holds that, in order to do complete justice, delay compensation required by the fifth amendment in section 1498 may be measured by compound interest.

The reasons to compound interest to achieve the measure of delay compensation in this case are not unique to plaintiff, but are to patent suits against the Government. Eminent domain cases involving takings of land may or may not evolve from takings of land applied in commerce. A patent holder, in contrast, has been given a limited license to monopolize his invention, and the Government's unauthorized use of a patented item frustrates the economic expectations generated by the patent. The taking in an infringement action always impacts on a established or potential commercial

exploitation of a patent if the patent holder either has commercialized the patent or is in the business of commercializing a similar product or process as that called for by the patent. This may not be true in takings of land. Although defendant, bolstered by forceful precedent, resists the notion that eminent domain condemnees may be treated differently in respect of delay compensation, this court restricts its holding to the precise exercise of the eminent domain power in the case at bar. It is no reason for refusing to allow compounded interest in an appropriate case that the nature of the interest taken by the Government is the same as that in a case in which the allowable method for fixing delay compensation differs.

### 2. *Facts and circumstances*

■ Following *Dynamics*, the Federal Circuit in *Branning* upheld an award of simple interest in a case involving the taking of land because plaintiff had "failed to produce any evidence during the trial of the case that an allowance of simple interest would be inadequate to provide just compensation...." 784 F.2d at 364. Defendant asks for the same ruling in this case.

It is significant that the appeals court in *Dynamics*, in directing the trial court to consider facts and circumstances particular to that plaintiff's case, summarized testimony that would be offered on behalf of any patent holder/established corporation that does business in the United States— the commercial reality of compound interest. 766 F.2d at 520 n. 5 (quoted *supra* at p. 234.) Similarly, it may be noted that if he had testified in this case, defendant's expert Dr. Robert L. Losey would not have opined that simple interest was appropriate.[16]

---

**16.** Post-trial briefing was ordered to resolve defendant's RUSCC 41(b) motion in that defendant had argued that case law required plaintiff to introduce evidence of facts and circumstances to support its claim to compound interest. *See* Order entered on Dec. 12, 1988, ¶ 5. Based on the record of trial and defendant's litigation position, as discussed more fully in the text of this opinion, the court was concerned because

defendant had not put on its delay compensation case. After trial the court became aware that defendant's expert on delay compensation had testified recently in another patent accounting trial before the Claims Court and that his testimony was not consistent with defendant's retreat from the position that compounding was proper. Consequently, the court directed the parties to this testimony. *See* Order entered on

The parties were on notice since October 29, 1987, that trial was limited to five days. Over plaintiff's objection, the court allowed defendant to call Dr. Losey on day 6. Defendant had requested only one additional day and made no showing that one day was inadequate. On day 6 defense counsel stated that he would not call the witness since the one day allowed was insufficient time. Defendant proffered that Dr. Losey would have urged an adjustment to compound interest to account for the lower federal tax rates in the mid–1980's (a drop from 48 to 34 percent) in order to avoid giving plaintiff a windfall. Indeed, in its pretrial memoranda and at the November 29, 1988 pretrial conference defendant did not object to compound interest, provided that an adjustment were made to account for the favorable tax consequences to plaintiff.

Feb. 13, 1989. Defendant objected to it, and plaintiff elected to file no brief. Defendant takes the position that the court is not deciding the case based on the trial record to the extent that it relies on Dr. Losey's testimony.

The February 13, 1989 order quoted the following testimony from Dr. Losey:

When I was called in on the Dynamics case, a question was put to me, would you be willing to argue for simple interest, which was the legal standard that at least was considered a possibility at that time. Any my response was there was no possible way that I will argue for simple interest. It makes no sense. It is illogical. It defies the market. It does not consider the facts of the situation. It does not make the counterparty whole.

Transcript of proceedings, *Hughes Aircraft Co. v. United States,* 209 Ct.Cl. 446, 534 F.2d 889 (1976). This transcript is a matter of public record.

Defendant exaggerates the reference to this testimony and the court's reliance upon it. First, it was not taken out of context—in fact, there was no context. The witness volunteered the testimony on cross-examination. It was neither solicited nor offered in connection with discussion of the methodology applied in the case in which he was then testifying. In the quoted testimony, Dr. Losey explained that he told the Government he would not advocate simple interest when he was consulted in yet another case—the *Dynamics* litigation. Second, the testimony is consistent with defense counsel's assertion that the Government does not object to compound interest in this case. Third, the court does not rely on the testimony, except that it demonstrates that defendant's decision not to call Dr. Losey did not deprive the record of cogent evidence on the propriety of compounding. Dr. Losey's testimony is not neces-

Defendant's fourth issue on delay compensation for trial read: "Should income taxes on accrued royalties under the license 'taken' by the Government be taken into account where compound interest is used to calculate delay compensation?" Def's Statement of Issues, filed Nov. 17, 1988, at 5.[17] Defense counsel also stated during the pretrial conference:

Mr. MOLAN: Your Honor, the point that we were trying to make and perhaps it may have not come through in the brief, was simply that we recognize that compound interest should be used. However, we also recognize that when you are dealing with something like a royalty payment, which is taxable, unless the tax payable on those royalty payments is taken into account[,] the Plaintiff would

sary to the decision to compound interest in this case. Plaintiff adduced sufficient evidence to support the methodology.

17. Paragraph 15 of Appendix G limits relevant evidence to the issues listed for trial by each party:

No later than the date for filing the Memorandum of Contentions of Fact and Law, the parties shall also file a joint statement setting forth the issues of fact and and the issues of law to be resolved by the court. Issues should be set forth in sufficient detail to enable the court to resolve the case in its entirety by addressing each of the issues listed. The statement of issues shall control the admissibility of evidence at trial and evidence will be deemed to be irrelevant unless it pertains to one or more of the issues.

Defendant's first three issues on delay compensation read:

What is an appropriate amount to compensate ITT for the delay in payment of the reasonable royalty due for the Government's use of the '182 and '797 patents?

Is an amount of delay compensation calculated using after tax proceeds from accrued royalties that are invested and reinvested together with accumulated after tax interest in an actual series of 52–week Treasury Bills appropriate compensation for the delay in payment of the reasonable royalty due ITT for the Government's use of the '182 and '797 patents?

Is the computation of delay compensation from the mid point of annual delivery periods appropriate since specific delivery dates from year to year for infringing devices are unknown?

Def's Statement of Issues, filed Nov. 17, 1988, at 4.

receive in effect, a windfall, in that they would be getting what we would call an IRA effect. That is, they would be receiving compounding on money that should have been paid in taxes.

Transcript of Proceedings, No. 48–84C, Nov. 29, 1988, at 67–68.

It was only after plaintiff had withdrawn its request for interest compounded at or above the prime rate that defendant moved for involuntary dismissal pursuant to RUSCC 41(b) (renewed after trial) on the ground that plaintiff had failed to put on any evidence justifying compound interest. Of course, this motion was not well taken, since plaintiff had introduced the ITT/Allied agreement, urged by defendant for the appropriate royalty rates, as evidence that plaintiff was to be paid at the prime rate of interest, compounded annually for delayed payment of royalties. Defendant thus disserves the record by representing that plaintiff failed to offer any evidence to support compounding.

■■■ The court respects the instruction in *Dynamics*, 766 F.2d at 520, repeated in *Branning*, 784 F.2d at 364, that compounding may only be appropriate if the record reflects facts and circumstances justifying its application. However, requiring plaintiff to adduce evidence of a market or commercial fact not subject to debate, *i.e.*, that any commercial player borrows at compound interest, is not a meaningful evidentiary effort. This is especially true since defendant does not disagree beyond the notion that plaintiff somehow make a showing of some kind, which plaintiff accomplished through the ITT/Allied and ITT/Hughes license agreements, both of which applied compound interest for delayed royalty payments. The court is prepared to take judicial notice that compound interest is a market or commercial reality for any corporation that does business in the United States. This finding does not underpin a further finding that compound interest is always warranted by the facts and circumstances of a given case. However, because defendant did not object to compound interest in this case, because the method that plaintiff requests was within

plaintiff's commercial expectation in exploiting its patents through the ITT/Allied and ITT/Hughes agreements, and because the commercial reality of compounding is a matter appropriate for judicial notice, the facts and circumstances exist to support an award of delay damages based on compounded interest. No evidence was presented that compounding interest would be inequitable.

■■■ The court does not resolve the issue ignorant of defendant's tax effect methodology. It may not be part of the trial, but it has been discussed in the record of proceedings. Supreme Court precedent is not hospitable to defendant's tax effect theory. Although the effect of income tax is relevant to determining a non-taxable recovery based on future earning capacity under the Federal Employees Labor Act, *Norfolk & Western Ry. v. Liepelt*, 444 U.S. 490, 494, 100 S.Ct. 755, 757, 62 L.Ed.2d 689 (1980), when a recovery is to be taxed at the time it is received, it is improper to calculate damages based on tax rates at the time the injury was sustained. *Hanover Shoe v. United Shoe Mach.*, 392 U.S. 481, 503, 88 S.Ct. 2224, 2236, 20 L.Ed.2d 1231 (1968). This is true even though higher tax rates prevailing at the time of injury would have reduced the amount of money available for investment. Reducing a taxable recovery by a hypothetical tax before award is made would result in double taxation. *Id.*

■■■ The present situation is well within the rule of *Hanover Shoe*. Here, defendant argues that a hypothetical tax applied at the times of hypothetical royalty and interest payments demonstrates that compound interest overcompensates plaintiff. This is no different than stating that because earlier taxation would have resulted in less total interest accumulation for plaintiff, its taxable recovery measured by compound interest should be reduced correspondingly. The court rejects this theory. If changes in tax rates from the time of injury to the time of recovery do not justify predicating a taxable recovery on the effect of the earlier rates, neither should the practice of compounding. The court concludes

that defendant's "tax effect" does not prevent the use of compound interest to measure delay damages in this case.

Even if defendant's argument that tax consequences must be given consideration were to be accepted, the court is of the view that sufficient adjustments have been made to plaintiff's claim to avoid excessive compensation. The inability to ascertain the installed value of the accused devices; the reduction in the compensation base; and the adoption of the ITT/Allied royalty rates, as adjusted, are indicia that the award is not excessive. Moreover, the parties concur that, assuming compound interest were held to be an allowable method of awarding delay compensation, the 52-week Treasury bill rates should apply. During the accounting period, these rates were lower than the rates for the corresponding time frames called for by 26 U.S.C. § 6621. A final factor militating against an excessive award in this case is that the compensation base is low in the early years, as to which compounding would have the most profound effect, compared with recent years.

Appendix III sets out the agreed-upon interest rates appearing in DX-4660. Appendix IV applies interest rates, compounded, to the yearly royalties that have been calculated.

### CONCLUSION [18]

■ Based on the foregoing, plaintiff is entitled to an award of $1,121,190.11 through April 30, 1989, although sales are fixed as of the stipulated date of July 22, 1988. The court notes that the award is low relative to plaintiff's expenditure of time and effort to achieve it. Reasonable and entire compensation requires a three-part analysis to determine the compensation base, royalty rate, and delay compensation. The outer parameters of plaintiff's potential recovery in each of the three stages were fixed by Hughes' fiber optic sales, a reasonable royalty rate based upon the proofs, and the stipulated rates for compounding. Had plaintiff obtained everything that it wanted in respect of the first two elements, the award would have increased less than threefold.

The parties shall file a Joint Status Report by May 1, 1989, proposing a course of action that will allow entry of judgment on all plaintiff's claims consistent with this opinion. If the parties' recalculation of compound interest differs from Appendix IV, the matter can be addressed in the Joint Status Report.

The following order is entered on May 12, 1989:

Pursuant to the parties' Joint Status Report filed on May 1, 1989, the Clerk of the Court shall enter judgment for plaintiff in the amount of $1,121,190.11, as of April 30, 1989, the plus $221.74 for each day after April 30 through May 1, 1989. The *per diem* rate for delay compensation is $221.74.

IT IS SO ORDERED.

### APPENDIX I

| Category 1A | | | % Applied | | Total Compensation Base | | |
|---|---|---|---|---|---|---|---|
| 1978 | 3,600*/390,704** | = | .9214% | × | 534,676 *** | = | $ 4,927 |

---

[18]. Defendant's motion *in limine* filed on November 29, 1988, the date of the pretrial conference, was granted, based on the authorities cited therein, insofar as defendant sought to exclude evidence of plaintiff's attorneys' fees and other litigation expenses and insofar as defendant sought to restrict plaintiff to the court's ruling in *ITT Corp.,* 10 Cl.Ct. 335–37 & n. 5, *i.e.,* that the preamble to Claim 2 of the '182 patent could not constitute a claim limitation. *See supra* note 1. These rulings were made before trial. The motion is denied insofar as it seeks to prevent plaintiff, for failure to make discovery, from relying on the entire market value rule. The motion addressed discovery problems earlier known to defendant and was filed too late to permit opposition and a ruling before commencement of trial. Moreover, by mutual agreement, the parties were preparing their respective cases on the compensation base up to the date of pretrial. Even during trial defendant was revising its own case and serving additional information on plaintiff.

|  | Category 1A |  | % Applied |  | Total Compensation Base |  |  |
|---|---|---|---|---|---|---|---|
| 1979 | 35,754/390,704 | = | 9.151% | × | 534,676 | = | 48,929 |
| 1980 | 26,366/390,704 | = | 6.75% | × | 534,676 | = | 36,082 |
| 1981 | 151,098/16,410,623 | = | .9207% | × | 16,149,319 | = | 148,692 |
| 1982 | 114,262/16,410,623 | = | .6962% | × | 16,149,319 | = | 112,444 |
| 1983 | 198,327/16,410,623 | = | 1.208% | × | 16,149,319 | = | 195,170 |
| 1984 | 152,906/16,410,623 | = | .9317% | × | 16,149,319 | = | 150,471 |
| 1985 | 111,154/16,410,623 | = | .6773% | × | 16,149,319 | = | 109,384 |
| 1986 | 167,212/16,410,623 | = | 1.018% | × | 16,149,319 | = | 164,549 |
| 1987 | 140,816/16,410,623 | = | .858% | × | 16,149,319 | = | 138,574 |
| 1988 | 131,255/16,410,623 | = | .7998% | × | 16,149,319 | = | 129,165 |

\* Total yearly sales in category for government end use reflected in DX–4835.

\*\* Total yearly sales in all categories for government end use for the years 1978–1980 per DX–4835.

\*\*\* Plaintiff's representation of total yearly sales for 1978–1980 in all categories for government end use per PX–3116.

## APPENDIX II

| YEAR | ADJUSTED CATEGORY TOTAL 1A Def: | ROYALTY RATE 7% | CATEGORY 1B | ROYALTY RATE 7% | CATEGORY 2A | ROYALTY RATE 7% | CATEGORY 2B | ROYALTY RATE 7% |
|---|---|---|---|---|---|---|---|---|
| 1978 | 4,927 | 345 | — | — | 11,521 | 806 | — | — |
| 1979 | 48,929 | 3,425 | — | — | 18,665 | 1,307 | — | — |
| 1980 | 36,082 | 2,526 | — | — | 39,206 | 2,744 | — | — |
| 1981 | 148,692 | 10,408 | 4,905 | 343 | 140,968 | 9,868 | — | — |
| 1982 | 112,444 | 7,871 | — | — | 182,618 | 12,783 | — | — |
| 1983 | 195,170 | 13,662 | 15,095 | 1,057 | 183,015 | 12,811 | — | — |
| 1984 | 150,471 | 10,533 | 2,196 | 154 | 137,576 | 9,630 | 1,004 | 70 |
| 1985 | 109,384 | 7,657 | 320 | 22 | 101,065 | 7,075 | 221 | 15 |
| 1986 | 164,550 | 11,518 | 40,531 | 2,837 | 187,962 | 13,157 | 10,929 | 765 |
| 1987 | 138,574 | 9,700 | 189,248 | 13,247 | 135,279 | 9,470 | 10,669 | 747 |
| 1988 | 129,165 | 9,042 | 858 | 60 | 133,869 | 9,371 | 10,293 | 721 |

| YEAR | CATEGORY 3 TOTAL | ROYALTY RATE 7% | CATEGORY 4 | ROYALTY RATE 6% | CATEGORY 5 | ROYALTY RATE 8% | CATEGORY 6A | ROYALTY RATE 3.25% |
|---|---|---|---|---|---|---|---|---|
| 1978 | 64 | 5 | — | — | — | — | — | — |
| 1979 | 5,575 | 390 | — | — | — | — | — | — |
| 1980 | 8,030 | 562 | 149 | 9 | — | — | — | — |
| 1981 | 233,644 | 16,355 | — | — | 10,238 | 819 | 37,979 | 1,234 |
| 1982 | 637,623 | 44,634 | — | — | 14,650 | 1,172 | 58,705 | 1,908 |
| 1983 | 556,250 | 38,937 | 62,692 | 3,671 | 2,506 | 201 | 173,400 | 5,636 |
| 1984 | 595,203 | 41,664 | 105,985 | 6,359 | 107,709 | 8,617 | 99,032 | 3,219 |
| 1985 | 611,312 | 42,792 | 9,786 | 587 | 121,556 | 9,724 | 1,077,343 | 35,014 |
| 1986 | 1,062,451 | 74,372 | 9,552 | 573 | 169,150 | 13,532 | 906,090 | 29,448 |
| 1987 | 737,416 | 51,619 | 22,771 | 1,366 | 100,759 | 8,061 | 1,121,767 | 36,457 |
| 1988 | 165,542 | 11,588 | 3,145 | 189 | 76,068 | 6,085 | 225,051 | 7,314 |

| YEAR | CATEGORY 6B | ROYALTY RATE 4% | CATEGORY 7A | ROYALTY RATE 7% | CATEGORY 7B | ROYALTY RATE 3.5% |
|---|---|---|---|---|---|---|
| 1978 | — | — | 130 | 9 | — | — |
| 1979 | — | — | 120 | 8 | — | — |
| 1980 | — | — | 140 | 10 | — | — |
| 1981 | 2,299 | 92 | 43,168 | 3,022 | — | — |
| 1982 | 46,140 | 1,846 | 8,895 | 623 | — | — |
| 1983 | 312,236 | 12,489 | 1,332 | 93 | 10,718 | 375 |
| 1984 | 325,088 | 13,004 | 42,957 | 3,007 | — | — |

| YEAR | CATEGORY 6B | ROYALTY RATE 4% | CATEGORY 7A | ROYALTY RATE 7% | CATEGORY 7B | ROYALTY RATE 3.5% |
|------|------------|-----------------|-------------|-----------------|-------------|-------------------|
| 1985 | 83,728  | 3,349  | 75,315 | 5,272 | —      | —     |
| 1986 | 62,407  | 2,496  | 29,399 | 2,058 | 23,743 | 831   |
| 1987 | 269,109 | 10,764 | 35,630 | 2,494 | 28,541 | 999   |
| 1988 | 100,263 | 4,011  | 14,335 | 1,003 | 98,167 | 3,436 |

| YEAR | CATEGORY 11A | ROYALTY RATE 7% | CATEGORY 11B | ROYALTY RATE 3.5% | ALL CATEGORIES |
|------|------|------|--------|-------|---------|
| 1978 | 5,139  | 360   | —      | —     | 1,525   |
| 1979 | 17,710 | 1,240 | —      | —     | 6,370   |
| 1980 | 33,335 | 2,333 | —      | —     | 8,184   |
| 1981 | 52,072 | 3,645 | 6,333  | 222   | 46,008  |
| 1982 | 28,407 | 1,989 | 31,080 | 1,088 | 73,912  |
| 1983 | 15,960 | 1,117 | 5,120  | 179   | 90,319  |
| 1984 | 5,025  | 352   | 1,653  | 58    | 96,666  |
| 1985 | 2,266  | 159   | —      | —     | 111,666 |
| 1986 | 6,116  | 428   | —      | —     | 152,016 |
| 1987 | —      | —     | —      | —     | 144,925 |
| 1988 | 3,741  | 262   | —      | —     | 53,081  |

TOTAL 784,673

## APPENDIX III

### TREASURY BILL RATES *

| Period | Bid | Ask | Yield |
|--------|-----|-----|-------|
| 7/78–6/79 | 7.73  | 7.69  | 8.26 ** |
| 7/79–6/80 | 8.65  | 8.63  | 9.35 ** |
| 7/80–6/81 | 7.84  | 7.78  | 8.37    |
| 7/81–6/82 | 13.24 | 13.18 | 14.80   |
| 7/82–6/83 | 12.80 | 12.74 | 14.25   |
| 7/83–6/84 | 8.89  | 8.85  | 9.61    |
| 7/84–6/85 | 11.11 | 11.09 | 12.23   |
| 7/85–6/86 | 7.33  | 7.29  | 7.80    |
| 7/86–6/87 | 6.03  | 6.01  | 6.37 ·  |
| 7/87–6/88 | 6.30  | 6.28  | 6.67    |
| 7/88–6/89 | 6.99  | 6.95  | 7.42    |

\*   Represented by plaintiff as quoted from The Wall Street Journal for one-year or 52–week Treasury bills on the date closest in time to July 1 of each year.
\*\*  Interpolated by defendant from balance of data furnished by plaintiff in PX–3141.

(DX–4660)

---

## APPENDIX IV

| Year | Royalty Amount* | Annual % Rate | Monthly Factor | Annual Factor | Compound Factor ** | Total Comp. |
|------|-----------------|---------------|----------------|---------------|--------------------|-------------|
| 1978–79 | $ 1,525 | 8.26 | 1.00688 | 1.08580 | 2.96956 | $ 4,528.57 |

| Year | Royalty Amount* | Annual % Rate | Monthly Factor | Annual Factor | Compound Factor ** | Total Comp. |
|---|---|---|---|---|---|---|
| 1979–80 | 6,370 | 9.35 | 1.00779 | 1.09761 | 2.73490 | 17,421.32 |
| 1980–81 | 8,184 | 8.37 | 1.00698 | 1.08699 | 2.36080 | 19,320.78 |
| 1981–82 | 46,008 | 14.80 | 1.01233 | 1.15846 | 2.17188 | 99,923.63 |
| 1982–83 | 73,912 | 14.25 | 1.01188 | 1.15219 | 1.87479 | 138,027.32 |
| 1983–84 | 90,319 | 9.61 | 1.00801 | 1.10045 | 1.62716 | 146,963.38 |
| 1984–85 | 96,666 | 12.23 | 1.01019 | 1.12939 | 1.47863 | 142,933.59 |
| 1985–86 | 111,666 | 7.80 | 1.00650 | 1.08085 | 1.30923 | 146,196.21 |
| 1986–87 | 152,016 | 6.37 | 1.00531 | 1.06559 | 1.21129 | 184,136.18 |
| 1987–88 | 144,925 | 6.67 | 1.00556 | 1.06878 | 1.13673 | 164,741.01 |
| | d | | | | c | b |
| 1988–89 | 53,081 | 7.42 | 1.00618 | 1.06358 | 1.06358 | 56,456.02 |

a

TOTAL $784,672                                TOTAL   $1,121,190.11

Delay compensation as of April 30, 1989:                      $  336,518.11

For each day after April 30, 1989, add: ***                   $      221.74

\*    Assumes a mid-year delivery point

\*\*   Compound factor is equal to annual factor for the year multiplied by the compound factor for the preceding year. <u>E.g.</u> For 1987–1988: $1.06878 \times 1.06358 = 1.13673$.

\*\*\*  Determination of daily amount is based on the following formula: Daily Amt. $= (((a - b)/c) + d)) \times ((e-1) \times 1/365)$

a = $1,121,190.11
b = $    56,456.02
c =        1.06358
d = $    53,081.00
e =        1.07678   (1988–1989 monthly factor raised to the twelfth power)